JONATHAN FROST & others *vs.* INHABITANTS OF BELMONT & others.

Under *St.* 1847, *c.* 37, this court have jurisdiction in equity, upon a proper case being made, to compel the restoration of money, with interest thereon, to the treasury of a town, which has been taken therefrom and applied to illegal purposes by officers of the town, under a vote of a majority of the inhabitants thereof.

A town has no authority to appropriate money for the payment of expenses incurred by individuals, prior to its corporate existence as a town, in procuring the passage of its charter.

Services rendered in procuring the passage of an act of legislation by means of secret attempts to secure votes, or sinister or personal influences upon members, are not a legal consideration for a contract.

In taxing costs for counsel fees, to be paid out of a fund in controversy, the court will not allow all charges which may be proper in the particular case, as between counsel and client, but will refer as a general guide to the compensation usually paid to public officers for services of a similar character.

BILL IN EQUITY filed April 29, 1859, and served by subpœna upon the following day, by various inhabitants and tax payers

of the town of Belmont against the inhabitants of said town, the assessors and treasurer thereof, and the president, directors, & Co. of the Bunker Hill Bank, alleging that at a town meeting of the inhabitants of the town held on the thirteenth of April 1859, under a warrant containing a proper article for that purpose, it was voted, notwithstanding the protest of some of the plaintiffs against the legality of the vote, " that the town will pay the expenses of obtaining their act of incorporation, and for that purpose the treasurer of the town be and hereby is authorized to borrow upon the notes of the town signed by him a sum sufficient for that purpose, not exceeding $9000; and pay over such sums therefrom and upon such vouchers as may be approved by Jacob Hittinger, Mansir W. Marsh, J. V. Fletcher and Jonas B. Chenery, the sub-committee of the petitioners for the incorporation of the town of Belmont;" that there were other votes authorizing the treasurer to borrow money for other purposes; that the town meeting was not adjourned until seven o'clock in the evening; that the town had not then any funds in its possession; that Samuel O. Mead, Jacob Hittinger and Edward B. Grant, all of them inhabitants of the town, on that day presented claims for expenses incurred in obtaining the act of incorporation, to the amount of $8773.82, all of which were approved by the sub-committee, and paid by George S. Adams, the town treasurer, on the same day, by checks upon his own funds in the Bunker Hill Bank, of which he was a director; that on the same day he executed a note in the name of the town for $9000 payable to the Bunker Hill Bank in six months from date, which he procured to be discounted there on the next day, and placed the funds to his credit; that the amounts paid to Mead, Hittinger and Grant were illegally paid, for the purpose of reimbursing them for expenses incurred in unsuccessful attempts to procure an act of incorporation for the town in years previous to 1859, and in procuring the act of incorporation in that year, and sundry items thereof were stated, which are referred to in the opinion; that the sums were not legally, necessarily or properly expended in procuring said act; and that the officers of the Bunker Hill Bank had notice of the facts.    The

prayer was for a discovery of the facts by the defendants, and that the note to the Bunker Hill Bank might be declared void, and for an injunction to restrain the payment, renewal, transfer or collection thereof, or the assessment of taxes to provide for the payment thereof, and for other and further relief.

The answer of the inhabitants of Belmont, made in January 1860, set forth simply that they had paid and received back the note to the Bunker Hill Bank. The answer of George S. Adams, the town treasurer, made at the same time, set forth that on the 12th of April 1859, knowing that the town had no funds, and that it would be necessary to borrow money in anticipation of income from the collection of taxes, and that a town meeting had been warned, to be held the next day, for the purpose of conferring upon him the power to borrow money, he, acting solely in his capacity of town treasurer, and not as a director of the bank, made application to the board of directors, stating to them the above facts, and they voted, without his participating therein, to discount the notes of the town, when the same should be presented, to an amount not exceeding $10,000; that he was not aware that any protest was made in town meeting against the legality of the vote respecting these claims; and that the checks given by him to Mead, Hittinger and Grant were signed by him as treasurer, and the note was drawn at the same time for the purpose of raising funds to meet the same, and was discounted the next morning before the presentation of the checks, and the amount placed to the credit of the town, and that the bills were thus paid.

The answer of the President, Directors & Co. of the Bunker Hill Bank, made at the same time, set forth simply that the note had been paid and delivered up, and that they were in no manner interested in the subject matter of the bill.

The case was submitted to the court, and reserved by *Dewey,* J., for the determination of the whole court, upon the bill and answers, and upon the further facts, which were agreed, that the moneys expended by Mead, Hittinger and Grant were expended for the purpose of procuring an act of incorporation for the town; that a portion of the money paid to them was to

reimburse them for money expended in unsuccessful attempts to procure such act in 1854, 1855, 1856, 1857 and 1858, and a portion for expenses incurred in procuring the act of 1859, by which the town was incorporated; and that the officers of the Bunker Hill Bank had no knowledge of the facts relating to the note, except so far as stated in the answer of Adams. This case was argued in March 1862.

*C. B. Goodrich & I. J. Austin*, for the plaintiffs. 1. A town has no authority to apply money to the payment of debts created prior to its incorporation, except so far as the same are imposed upon the town in and by the act of incorporation. By providing specifically in the charter for the payment of certain debts, and omitting the expenses in question, the legislature have decided that the latter were not a proper subject of charge upon the town. *St.* 1859, *c.* 109. *Ayers* v. *Knox,* 7 Mass. 306. *Norton* v. *Mansfield,* 16 Mass. 48, 51. *Andover and Medford Turnpike* v. *Gould,* 6 Mass. 44. *Munt* v. *Shrewsbury & Chester Railway,* 13 Beav. 1. The expenses of procuring a charter, whether necessary or otherwise, are not such as the town may lawfully pay. Gen. Sts. *c.* 18, § 10. *Hood* v. *Lynn,* 1 Allen, 103, and cases cited. *Claflin* v. *Hopkinson,* 4 Gray, 502. *Vincent* v. *Nantucket,* 12 Cush. 103, and cases cited. *Pope* v. *Halifax,* Ib. 410. *Cooley* v. *Granville,* 10 Cush. 56. *Tash* v. *Adams,* Ib. 252. *Keyes* v. *Westford,* 17 Pick. 279. *Haliburton* v. *Frankfort,* 14 Mass. 214. 2. The town treasurer misapplied the money of the town. He knew that the vote was for an illegal purpose, and is responsible. *Smith* v. *Watson,* 2 B. & C. 407. *Fairfield* v. *Baldwin,* 12 Pick. 388, 397. *Minor* v. *Mechanics' Bank,* 1 Pet. 46, 72. *Bank of Washington* v. *Barrington,* 2 Penn. 27. *Bank of U. S.* v. *Dunn,* 6 Pet. 51, 58. Many of the items were unnecessary, as for wines, tavern bills, and lobby services. 3. The Bunker Hill Bank must be regarded as a party to the perversion of the money. 4. This suit is brought for the benefit of the town; and the court should direct Adams, if he has misapplied the money of the town, to repay it.

*H. W. Paine & N. St. J. Green,* for the defendants. No injunction has been issued; and none can now be effectual. The

note has been paid.   The *St.* of 1847, *c.* 37, contemplates relief by injunction alone.   Besides ; the bill contains no prayer under which the plaintiffs can have specific relief.   Under a prayer for general relief, no decree for specific relief can be made, except such as is consistent with the case by the bill.   The relief asked for is inconsistent with the case made by the bill.   The bank had both a legal and an equitable right to enforce the collection of the note.   The knowledge of Adams could not affect the bank.   *Washington Bank* v. *Lewis,* 22 Pick. 24.   The bank might well assume that the treasurer acted upon the consent and advice of the selectmen, and this court should assume, in the absence of any proof to the contrary, that such was the fact. *Knox County Commissioners* v. *Aspinwall,* 21 How. (U. S.) 539. *Royal British Bank* v. *Turquand,* 6 El. & Bl. 327.  But whether it could have enforced the collection or not, having received the money it should not be required to refund it.   The treasurer in giving the note did just what he was required to do by the vote. He had no notice that the legality of the vote would be contested.   Nothing was left to his judgment or discretion.   No preliminary injunction has been obtained.   It was his duty to pay the note.   And if the plaintiffs have suffered, it is in consequence of their own laches, and not of any wrongful act on his part.   To require him to replace the entire sum in the treasury would be to grant relief to the majority of the inhabitants, who do not ask it. . It does not appear that the plaintiffs ever have paid any portion of the sums, and it is by no means certain that they ever will.   They may have ceased to be inhabitants or taxpayers in the town.

CHAPMAN, J.   This suit is brought under *St.* 1847, *c.* 37, reenacted in Gen. Sts. *c.* 18, § 79, without any change except in phraseology.   The language in the General Statutes is as follows :

" When a town votes to raise by taxation or pledge of its credit, or to pay from its treasury, any money, for a purpose other than those for which it has the legal right and power, the supreme judicial court may, upon the suit or petition of not less than ten taxable inhabitants thereof, briefly setting

forth the cause of complaint, hear and determine the same in equity."

The defendants contend that the statute contemplates no relief except such as can be afforded by an injunction against proceeding to levy taxes or make payments, in the cases to which it relates; and that, the claims referred to in the bill having been paid before the suit was commenced, the plaintiffs can have no remedy in this case, however illegal or unjust the claims might be. But the court are of opinion that the authority to hear and determine a cause in equity includes the power to administer relief in any of the established methods used by courts of chancery, which may be adapted to the nature and circumstances of the case. It is one of the advantages of proceedings in chancery that they are flexible, and may be adapted to the emergencies of any case, so as to give relief that is effectual. If it were not so, this case affords an illustration of the fact that the statute might be so easily evaded as to be deprived of its principal value. It is manifest that the agents of the town, several of whom were interested in the claims, by hastening to settle them in the night time, immediately after the adjournment of the town meeting, and to have checks given for their amount, though they knew there were no funds to pay these checks, intended to accomplish an evasion of the statute, and believed they had succeeded in doing so. It would be a reproach to the law if such an attempt could succeed.

The court are also of opinion that by the bill, answer, pleas and facts agreed, a case is established within the statute. The object of the statute is, to protect minorities and persons who have no right of suffrage from an abuse of power by majorities, by expending the money of towns for illegal purposes. It regards the right of suffrage as a trust to be exercised for the common benefit, according to law; and it is a well established principle that town officers are trustees, and are bound to exercise their trust in good faith according to law. The plaintiffs in this suit are to be regarded as *cestuis que trust*, bringing the suit for themselves and all other parties interested in the proper execution of the trust. The court are to make such decrees as will

prevent the abuse of the trust, and effectually secure its proper execution on the part of each of the several trustees, taking care not to interfere with any discretionary powers that the law grants to the inhabitants or officers of towns.

The town of Belmont was incorporated by *St.* 1859, *c.* 109, and by its act of incorporation was declared to be "invested with all the powers and privileges, and subject to all the duties and requisitions of other incorporated towns, according to the constitution and laws of the Commonwealth." Some of its inhabitants had been endeavoring to procure an act of incorporation for several years, commencing in 1854; and had expended large sums of money for this purpose at every session of the legislature until they were at last successful. The sums they expended amounted to $8773.82. One of the items is for legal advice; several other items are for large sums paid to gentlemen who are lawyers by profession; several large items are for moneys paid to other persons for services, the nature of which is not specified; one item of $200 and one of $500 are charged as paid to "lobby members;" one is for $1180.42 paid at a house of public entertainment; one $967.92 is for "sundries," without specification; one of $25 is for wines; and the bills of Hittinger and Mead, amounting to $2833.82, leave us in entire ignorance of the particulars for which they were paid.

The act of incorporation does not provide for the payment of any of these expenses, and it has never been the custom of the legislature to make provision for the payment by towns newly incorporated of any part of the expenses incurred in procuring the passage of the act of incorporation. And the authorities cited by the plaintiffs establish the point for which they contend, that towns have no right under their general acts of incorporation, or under any of the statutes relating to the subject, to apply the money of the town to the payment of debts or expenses incurred by individuals prior to their corporate existence as a town, or to raise money for such a purpose. The town therefore had no authority to make any provision for the payment of any portion of these bills, because they are for expenses incurred before the town was incorporated.

But the objection to many of the principal items contained in these bills is of a much graver character; and it is to be regretted that any persons should have attempted to procure an act of legislation in this commonwealth by such means as some of these items indicate.

By the regular course of legislation, organs are provided through which any parties may fairly and openly approach the legislature, and be heard with proofs and arguments respecting any legislative acts which they may be interested in, whether public or private. These organs are the various committees appointed to consider and report upon the matters to be acted upon by the whole body. When private interests are to be affected, notice is given of the hearings before these committees; and thus opportunity is given to adverse parties to meet face to face, and obtain a fair and open hearing. And though these committees properly dispense with many of the rules which regulate hearings before judicial tribunals, yet common fairness requires that neither party shall be permitted to have secret consultations and exercise secret influences, that are kept from the knowledge of the other party. The business of "lobby members" is not to go fairly and openly before the committees, and present statements, proofs and arguments that the other side has an opportunity to meet and refute, if they are wrong, but to go secretly to the members and ply them with statements and arguments that the other side cannot openly meet, however erroneous they may be; and to bring illegitimate influences to bear upon them. If the "lobby member" is selected because of his political or personal influence, it aggravates the wrong. If his business is to unite various interests by means of projects that are called "log-rolling," it is still worse. The practice of procuring members of the legislature to act under the influence of what they have eaten and drunk at houses of entertainment tends to render those of them who yield to such influences wholly unfit to act in such cases. They are disqualified from acting fairly towards interested parties, or towards the public. The tendency and object of these influences are to obtain by corruption what it is supposed cannot be obtained fairly

It is a well established principle that all contracts which are opposed to public policy, and to open, upright and fair dealing, are illegal and void. The principle was fully discussed in *Fuller* v. *Dame*, 18 Pick. 472. In several other states it has been applied to cases quite analogous to the present case.

In *Pingry* v. *Washburn*, 1 Aiken, 264, it was held in Vermont that an agreement on the part of a corporation to grant to individuals certain privileges, in consideration that they would withdraw their opposition to the passage of a legislative act touching the interests of the corporation, is against sound policy, prejudicial to correct and just legislation, and void. In *Gulick* v. *Ward*, 5 Halst. 87, it was decided in New Jersey that a contract which contravenes an act of congress and tends to defraud the United States is void. A. had agreed to give B. $100, on condition that B. would forbear to propose or offer himself to the postmaster-general to carry the mail on a certain mail route, and it was held that the contract was against public policy and void. The general principle as to contracts contravening public policy was discussed in that case at much length. In *Wood* v. *McCann*, 6 Dana, 366, the defendant had employed the plaintiff to assist him in obtaining a legislative act in Kentucky legalizing his divorce from a former wife, and his marriage with his present wife. The court say, " A lawyer may be entitled to compensation for writing a petition, or even for making a public argument before the legislature or a committee thereof; but the law should not help him or any other person to a recompense for exercising any personal influence in any way, in any act of legislation. It is certainly important to just and wise legislation, and therefore to the most essential interest of the public, that the legislature should be perfectly free from any extraneous influence, which may either corrupt or deceive the members or any of them."

In *Clippinger* v. *Hepbaugh*, 5 Watts & S. 315, it was decided in Pennsylvania that a contract to procure or endeavor to procure the passage of an act of the legislature, by using personal influence with the members, or by any sinister means, was void, as being inconsistent with public policy and the integrity of our

political institutions. And an agreement for a contingent fee, to be paid on the passage of a legislative act, was held to be illegal and void, because it would be a strong incentive to the exercise of personal and sinister influences to effect the object.

The subject has been twice adjudicated upon in New York. In *Harris* v. *Roof,* 10 Barb. 489, the supreme court held that one could not recover for services performed in going to see individual members of the house, to get them to aid in voting for a private claim, the services not being performed before the house as a body, nor before its authorized committee. In *Sedgwick* v. *Stanton,* 4 Kernan, 289, the court of appeals held the same doctrine, and stated its proper limits. Selden, J. makes the following comment on the case of *Harris* v. *Roof* : " Now the court did not mean, by this decision, to hold that one who has a claim against the state may not employ competent persons to aid him in properly presenting such claim to the legislature, and in supporting it with the necessary proofs and arguments. Mr. Justice Hand, who delivered the opinion of the court, very justly distinguishes between services of the nature of those rendered in that case, and the procuring and preparing of the necessary documents in support of a claim, or acting as counsel before the legislature or some committee appointed by that body. Persons may no doubt be employed to conduct an application to the legislature, as well as to conduct a suit at law; and may contract for and receive pay for their services in preparing documents, collecting evidence, making statements of facts, or preparing and making oral or written arguments, provided all these are used or designed to be used before the legislature or some committee thereof as a body; but they cannot with propriety be employed to exert their personal influence with individual members, or to labor in any form privately with such members out of the legislative halls. Whatever is laid before the legislature in writing, or spoken openly or publicly in its presence or that of a committee, if false in fact, may be disproved, or if wrong in argument, may be refuted, but that which is whispered into the private ear of individual members is frequently beyond the reach of correction.

The point of objection in this class of cases, then, is the personal and private nature of the services to be rendered."

In *Fuller* v. *Dame*, cited above, Shaw, C. J. recognizes the well established right to contract and pay for professional services when the promisee is to act as attorney and counsel, but remarks that " the fact appearing that persons do so act, prevents any injurious effects from such proceeding. Such counsel is considered as standing in the place of his principal, and his arguments and representations are weighed and considered accordingly." He also admits the right of disinterested persons to volunteer advice ; as when a person is about to make a will, one may represent to him the propriety and expediency of making a bequest to a particular person ; and so may one volunteer advice to another to marry another person ; but a promise to pay for such service is void.

Applying the principles stated in these cases to the bills which the town voted to pay, it is manifest that some of the money was expended for objects that are contrary to public policy, and of a most reprehensible character, and which could not therefore form a legal consideration for a contract. The haste with which the bills were allowed and paid by checks upon a bank where the town had no funds, indicates that the officers of the town were not ignorant of the objectionable character of their proceedings. The treasurer who gave the checks and procured the discount of the note to meet them, and afterwards paid the note with the funds which he held in trust for the town to be applied only to its legal debts and liabilities, is to be regarded as a party to the illegal transaction, and is to be held responsible for the money as if he had made no application of it whatever, except to his own private use.

The president and directors of the Bunker Hill Bank do not appear to have had notice of the character of the transaction, unless they are to be charged with notice on the ground that Mr. Adams was a member of the board. Fidelity to the bank as one of its directors would have required him to give notice of the character of the note and the checks. But he presented the note as an applicant for discount, and did not act officially

with the other members in deciding the question whether it should be discounted. The court are therefore of opinion that his knowledge in this particular case is not to be regarded as notice to the bank; the officers who actually participated in making the discount having been deceived, and led to believe that the transaction was legitimate, and towns having authority to borrow money for municipal purposes. *Commercial Bank* v. *Cunningham*, 24 Pick. 270. The committee of the town who allowed the bills, and some of whom received part of the money, not being parties to this suit, there can be no decree as to them.

The plaintiffs and the other inhabitants of the town who did not vote for the appropriation have no remedy except by this process. One of the plaintiffs protested against the vote in open town meeting. The accounts were allowed, the checks were given, and the note was discounted at the bank so soon after the meeting that there was not time to consult counsel and procure an injunction before these acts were completed. Sixteen days afterwards the suit was commenced, and the note has been paid during its pendency. The plaintiffs have not been guilty of any laches, and they are entitled to a decree which shall restore the money to the town treasury with interest from the time when it was wrongfully taken therefrom, and which shall enjoin all parties from making any future application of the money or credit of the town to the payment of these unlawful claims, or to the indemnity of any parties who have paid them or may hereafter pay them, in any way, directly or indirectly.

The following decree was afterwards entered:

It is ordered and decreed that the bill be dismissed as to the President, Directors & Co. of the Bunker Hill Bank, with costs for the bank against the plaintiffs; and that the plaintiffs recover of the said George S. Adams, for the use of the town of Belmont, and to be paid by them to the treasurer of said town, less the costs and expenses hereinafter named, so much of the sum of nine thousand dollars as was taken by him from the treasury of the town to pay the said checks given by him, as set forth in said bill, viz: the sum of eight thousand seven hundred and

seventy-three dollars and eighty-two cents ($8773.82), with interest thereon from the fourteenth day of April, A. D. 1859; and that the plaintiffs further recover their costs of suit against said Adams and said town of Belmont, and that they be paid their reasonable counsel fees and expenses incurred in the prosecution of this suit, out of the moneys recovered as aforesaid for the use of the town; and in default of payment of said sums, that execution be issued therefor in due form of law, and delivered by the plaintiffs to a proper officer to collect the same. And when said sums are collected, the said officer shall pay over the same to the parties entitled thereto, viz : the said costs, counsel fees and expenses to the plaintiffs, and the balance to the treasurer of the town of Belmont for the time being, to be held by him for the use of the town.

And the inhabitants of said town of Belmont, and all their officers and servants, are hereby enjoined and commanded that they apply the said money to the payment of the legal debts and liabilities of the town, and to no other purpose; and that they shall not at any time, by their vote, or by taxation, or by pledge of the credit of the town, or by the use of its funds, or in any other manner, make any provision, directly or indirectly, for the payment of the money mentioned in the said claims of Jacob Hittinger and Samuel O. Mead, and of E. B. Grant, set forth in the bill, nor any part thereof, or for the indemnity, in whole or in part, of any person or persons by whom said sums of money have been paid or may hereafter be paid, in whole or in part, or of any persons who may be interested in the same, or in any way directly or indirectly to evade the true intent and effect of this decree.

After the entry of the foregoing decree, a question arose and was submitted to the full court in respect to the amount which the plaintiffs were entitled to tax in their costs for the fees of their counsel; which was disposed of as follows :

CHAPMAN, J. In the taxation of their costs, the plaintiffs claim that they should be allowed to charge upon the fund in controversy the whole amount which has been charged to them

by their solicitors, including their charges as counsel. These charges amount to a large sum, being $1750.

It has been the practice of the court to allow charges of this character, including charges for counsel fees as well as those which are strictly fees of solicitors, but not to allow the full amount which it may sometimes be proper for counsel to charge to clients. There is no uniform rule as to the charges which counsel make to clients. Each counsellor generally fixes the value of his own services; and the difference in the amount charged by different members of the bar, and in different parts of the Commonwealth, is very great. But it is necessary for the court to adopt a rule which shall have some degree of uniformity. The standard to which we have been accustomed to refer as a general guide is the compensation paid to public officers for services of a similar character. This reference cannot furnish an exact rule, and leaves room for the exercise of discretion as to each case, a discretion which shall take into consideration, among other things, the amount in controversy, and which will prevent the fund from being either entirely or in great part absorbed by counsel fees.

The rule in England, where costs are allowed as between solicitor and client, is not always to allow the whole amount charged by the solicitor, but to allow as many of the charges which he would have been compelled to pay his own solicitor as fair justice to the other party will permit. 3 Dan. Ch. Pr. 1580. And in England these charges are generally uniform.

In the present case, having reference to the standard above mentioned and to the circumstances of the case, the amount allowed the plaintiffs to be charged upon the fund is $350.