ARCTIC SLOPE NATIVE ASSOCIA-
TION, City of Barrow, City of Kaktovik,
City of Point Hope, City of Wainwright,
City of Anaktuvuk Pass, Appellants,

v.

Frederick PAUL and North Slope
Borough, Appellees,

NORTH SLOPE BOROUGH, Appellant,

v.

Frederick PAUL, Arctic Slope Native As-
sociation, City of Barrow, City of Kakto-
vik, City of Point Hope, City of Wain-
wright, and City of Anaktuvuk Pass, Ap-
pellees,

Frederick PAUL, Cross-Appellant,

v.

ARCTIC SLOPE NATIVE ASSOCIA-
TION, City of Barrow, City of Kaktovik,
City of Point Hope, City of Wainwright,
City of Anaktuvuk Pass and North
Slope Borough, Cross-Appellees.

Nos. 3792, 3793 and 3806.

Supreme Court of Alaska.

April 4, 1980.

Mark A. Sandberg, Stephen S. DeLisio, Merdes, Schaible, Staley & DeLisio, Charles K. Cranston, Gallagher, Cranston & Snow, Anchorage, for appellant/cross-appellee.

Ronald L. Bliss, Bradbury & Bliss, Anchorage, and Michael D. Garvey, Houger, Garvey & Schubert, Seattle, Wash., for appellee/cross-appellant.

Before RABINOWITZ, C. J., BOOCHEVER, BURKE and MATTHEWS, JJ., and COOKE, Superior Court Judge, Sitting as a Supreme Court Justice.

OPINION

MATTHEWS, Justice.

This case consists of appeals and a cross-appeal from a judgment of the superior court holding appellants Arctic Slope Native Association (ASNA), the cities of Barrow, Kaktovik, Anaktuvuk Pass, Wainwright, and Point Hope (hereinafter referred to as the Cities), and the North Slope Borough jointly and severally liable to appellee and cross-appellant Frederick Paul for attorney's fees incurred for the incorporation of the North Slope Borough.

Frederick Paul is a prominent authority on the law pertaining to Native Alaskans. He has been a member of the Alaska Bar since 1941. In 1966, Paul contracted with ASNA,[1] a non-profit, voluntary association of Inupiats inhabiting the North Slope, to represent the aboriginal title claims of the Inupiat people against the United States government. The contract provided that Paul's compensation would be conditioned upon a recovery of ASNA's claims, and further prescribed that the amount of such compensation would be determined by the court awarding the recovery.

During his tenure as ASNA's claims attorney, Paul also entered claims contracts with the North Slope native communities of Barrow, Kaktovik, Anaktuvuk Pass, and Wainwright.[2] These contracts were formally made in April, 1969 and contained terms identical to the earlier attorney contract with ASNA. In 1971, for his work on behalf of ASNA and the communities, Paul received an award of $274,000.00 from the United States Court of Claims.

The circumstances giving rise to the present controversy began in the spring of 1969. On March 6, 1969 Paul sent letters to

---

1. On August 24, 1966, Paul and his father, William L. Paul, Sr., entered into the first of two attorney contracts with ASNA for the land claims settlement work. On November 20, 1967, Paul contracted with ASNA by himself after the Bureau of Indian Affairs rejected the earlier contract because Paul, Sr., was not an active member of the Alaska Bar. The latter contract was made retroactive to August 24, 1966 and contained provisions roughly identical to the earlier version.

2. The contracts were not entered into by the municipal corporations of each of those communities. The signatory was the respective Community, Composed of Members, Bands, Clans, and Divisions of Inuit Natives (Eskimos). The terms "Inupiat" and "Inuit" were used interchangeably in this case.

ASNA and the various native communities on the North Slope proposing the creation of an incorporated borough for that region. The response to Paul's suggestion was generally favorable. Eben Hopson, then executive director of ASNA, wrote back to Paul on March 17, 1969, urging him "to go ahead and do some leg work on" the proposal. Paul received similar encouragement from Wainwright and Anaktuvuk Pass.

From April, 1969 until July 1, 1972, the date of the Borough's incorporation, Paul participated in the planning and organization of the Borough effort. Due in part to his work, the petition for incorporation was approved by the Local Boundary Commission and ratified by the residents of the North Slope.

After the Borough's creation Paul served as counsel for ASNA, and the Cities in a suit brought by Mobil Oil Corporation and other major oil companies challenging the Commission's approval of the borough petition.[3] Paul was eventually released by his clients on October 10, 1972, prior to the conclusion of that litigation.

On April 4, 1974, Paul filed this complaint in superior court naming as defendants ASNA, the Cities, and the Borough. Paul alleged that the defendants were liable for services he performed relating to the organization of the North Slope Borough. He asked that a reasonable fee be awarded him as compensation for his services.

Following a non-jury trial, the court found each of the defendants jointly and severally liable to Paul and entered an award of $185,789.15, including pre-judgment interest. The award was calculated at the rate of $125.00 per hour for 504 hours of work performed before April, 1969, and 639 hours of work performed thereafter.

In arriving at its decision, the court found that Paul had entered valid claims attorney contracts with ASNA and the Cities, and that ASNA and the Cities had expressly extended the existing contracts through subsequent oral agreements to cover Paul's

efforts to create the borough. The trial judge also ruled that the contingency provisions in the initial claims attorney contracts did not govern the terms of compensation for Paul's borough-related work, and that Paul could therefore recover in quantum meruit.

The court imposed liability on the Borough by finding that the Borough ratified Paul's contracts with ASNA and the native communities. The court reasoned that the Borough accepted the benefits received from Paul's services as performed under these contracts; that the Borough had full knowledge of all material facts; and that the Borough failed to repudiate the contracts in a timely manner upon incorporation. These acts, the court concluded, constituted ratification. The court also found that Paul represented the Borough from the date of the Borough's incorporation, July 1, 1972, until the Borough retained its own counsel on July 16, 1972. Lastly, the court awarded Paul attorney's fees of $55,-080.51 for the trial proceedings concluded below.

I

All of the appellants challenge the court's finding that Paul expended 504 hours on work, as the court put it, "directly attributable to the borough effort" from August of 1966 to April of 1969. This finding, of course, is one of fact and it cannot be disturbed on appeal unless it is clearly erroneous. Alaska Rule Civil Procedure 52(a). A finding is not clearly erroneous unless from a review of the entire record we are left with a "definite and firm conviction that a mistake has been made." *Steward v. City of Anchorage*, 391 P.2d 730, 731 (Alaska 1964) (footnote omitted). Our review of the evidence in this case has persuaded us that this standard has been met.

Paul submitted two exhibits which indicated that he had spent 2,017.63 hours on behalf of his North Slope clients from April of 1966 until April 15, 1969. However, the itemization on these exhibits

**3.** *Mobil Oil Corp. v. Local Boundary Comm'n.*, Superior Court No. 72–834, filed March 28, 1972, *aff'd, Mobil Oil Corp. v. Local Boundary Comm'n.*, 518 F.2d 92 (Alaska 1974).

shows that only four hours prior to April of 1969 were identified by Paul as relating to creation of the Borough. Paul stated that he did not begin to discuss the possibility of a borough with his clients until March 6, 1969. Before then he could only testify to three conversations with other individuals when the topic was raised. On March 6, 1969 Paul wrote a letter pertaining to formation of the Borough. Later in March he received two letters responding to it, and answered one of them. That is the extent to which the record supports Paul's professional efforts to form the Borough prior to April 1969. We conclude therefore that the court's finding that 504 hours were spent working on the Borough before April of 1969 is clearly erroneous, and must be set aside.

## II

█ We turn next to the Borough's challenge to the court's finding that the Borough, upon its creation, became jointly liable for Paul's fees.

The Borough argues that a municipal corporation is not liable to pay pre-incorporation expenses, citing *Frost v. Belmont*, 88 Mass. (6 Allen) 152 (1863) and *Louisville Extension Water Dist. v. Sloss*, 236 S.W.2d 265 (Ky.1951). These cases, however, do not constitute strong authority for that proposition. The *Frost* court disallowed lobbying expenses which the court characterized as "for objects that are contrary to public policy, and of a most reprehensible character. . . ." 88 Mass. at 162. *Sloss* was decided on the basis that municipal corporations may not be bound by implied contracts, a rule at variance with that prevailing in most jurisdictions. *See* 17 McQuillan, Municipal Corporations, § 49.61, at 311 (1968): "Municipalities are liable to actions on implied contracts."

4. AS 29.18.180(a) provides:
   *Organization grants.* (a) For the purpose of defraying the cost of transition to borough or city government and in order to provide for development and interim governmental operations, each borough and city incorporated after January 1, 1968, or, in the case of a second class city, incorporated or reclassified after January 1, 1968, other than a unified municipality incorporated under the pro-

Paul argues that the rule that a private corporation is liable for reasonable attorney's fees incurred in its creation should govern by analogy. As an example Paul cites *Ong Hing v. Arizona Harness Raceway, Inc.*, 10 Ariz.App. 380, 459 P.2d 107 (1969) where the court, quoting from *David v. Southern Import Wine Co.*, 171 So. 180, 182 (La.App.1936) stated:

A corporation brought into existence—given its life—by the service of an attorney, may not be heard to say that the service was unauthorized because rendered prior to incorporation. When the benefit of such service is received and accepted by the corporation, it cannot be heard to question the authority through which the service was employed. It may be that in such case the corporation may not be held to the express terms of a contract for such employment; in other words, it may not be held to the contract itself, but it may not repudiate the service entirely and yet reap the benefits therefrom. It may repudiate the contract price if a price has been agreed upon, but it may not refuse to pay for the service on the basis of the value of the benefits received; in other words, on a quantum meruit.

459 P.2d at 113.

We can see no reason why a municipal corporation should not be liable for reasonable legal expenses incurred in its formation. AS 29.18.180(a)[4] contemplates that a newly created municipality will have incurred organizational costs and we assume that legal expenses are often among them. We therefore affirm the court's finding that the Borough is jointly liable with ASNA.

## III

█ On the issue of the Cities' liability, the trial judge held:

visions of AS 29.85, or a municipality otherwise incorporated by consolidation, is entitled to an organization grant equal to $10 for every voter who voted in the borough or city incorporation election. However, each incorporated borough and each first class city incorporated or established by reclassification outside an organized borough is entitled to at least $25,000.

Although the 1969 contracts state that they are with the Communities of Barrow, Kaktovik, Point Hope, Wainwright, and Anaktuvik Pass, The Cities are bound by them. The evidence reveals that these contracts were adopted at general meetings of the people of The Cities with the full awareness and support of their municipal leaders, and were in fact vehicles utilized to conform with the standards of the Bureau of Indian Affairs in order to allow Mr. Paul to act on behalf of the five village municipalities in the presentation of their land claims to Congress. The trial judge further held that the Cities had "by oral agreement extended Mr. Paul's responsibilities under the contracts from presenting their land claims to [the creation of the North Slope Borough]."

The Cities take their appeal from the trial judge's finding that they were bound by the written claims attorney contracts from which their liability for the borough work derives. They point out that the contracts on which the court based its findings of liability were entered into with the native communities of Barrow, Kaktovik, Anaktuvuk Pass, Wainwright, and Point Hope, not with the respective municipalities and that there is no evidence that they adopted the contracts.

Considerable confusion appears to surround the use of the terms "community," "village," and "city" in the record below and the briefs of the parties. The following excerpt from the Anaktuvuk Pass agreement, representative of the others, is illuminating.

WHEREAS the Anaktuvuk Pass *Community* is composed of respective members, bands, clans, and divisions of Inuit natives (commonly called Eskimos) *living in that village*, and

WHEREAS *the within contract relates to said Eskimos individually and collectively* as said members, bands, clans, and divisions, *hereinafter collectively referred to as the TRIBE*; and

WHEREAS SAID TRIBE has heretofore delegated authority to the Arctic Slope Native Association on a regional basis *to protect the TRIBE in its aboriginal rights of use and occupancy and in those rights in which the TRIBE may be interested*; . . .

.   .   .   .   .

The TRIBE believes the Arctic Slope Native Association is a tribal unit and reaffirms its desire to work on a regional basis with its sister villages. Nevertheless, *the TRIBE is willing to protect itself through the employment of a lawyer on a village basis.*

[Emphasis added]. Thus, "community" refers to those Inuit natives living in a particular "village." These "villages" were municipal corporations of the fourth class.[5]

The minutes of the village meeting of Anaktuvuk Pass, relied on in part by the court below in determining that the contract was adopted by the "entire village," may have been particularly confusing in this respect. The minutes disclose, in part, that:

[T]he Secretary [of the Interior] advised that the [original ASNA] contract was not valid as ASNA was not considered a tribal unit. Though this conclusion was wrong, Mr. Paul advised it was easier to get a village contract [sic] and this is what should be done.   .   .   .

.   .   .   .   .

.   .   . [A] signatory committee of three was elected by the village membership. These three were authorized to sign the contract on behalf of the entire village.

While the minutes were signed by the secretary and attested to by the president of the village council, the contract itself was signed by the same individuals along with Simon Paneak and Amos Morry as representatives of "The Anaktuvuk Pass *Community*, composed of Members, Bands, Clans, and Divisions of Inuit Natives (Eskimos)" (emphasis added). An additional resolution indicates that those on the signatory committee were "members of the Tribe,

---

5. On September 10, 1972 they became cities of the second class. AS 29.08.050(b).

. . . selected as delegates to enter into and to execute said contract with said attorneys for and on behalf of said Tribe." Thus, the phrase "entire village" appears to have been used to mean "entire community," that is, all those Inuit natives living in the village.

The contracts were undertaken for the advancement and protection of the rights and interests of "the Tribe," a racially discrete population group within each municipal corporation. In *State v. Aleut Corporation*, 541 P.2d 730 (Alaska 1975), we stated:

> Although native corporations may perform certain quasi-governmental functions in parts of Alaska, they are not government organs in the sense of political bodies elected by all the citizens of voting age in a given area with regular governmental authority over all the inhabitants. Native regional corporations, . . . may have interests, . . . contrary to those of other affected persons who are not corporation members. This is not to say that a village government could not delegate certain municipal planning functions to a regional corporation, or appoint corporation planners as their representatives . . . In such instances, the regional corporation would simply be exercising the rights of the villages, rather than its own.

*Id.* at 738. In the case at bar, we can find no evidence of either an express or implied delegation of municipal authority to the respective native communities. The signatories of the attorney contracts were representing the interests of "the Tribe" and not necessarily those of the village municipal corporations as a whole. Among the residents of the Cities are individuals who are not Inuit natives. We find no evidence of adoption of the contracts by the village municipal corporations. Thus, the lower court's finding that "these contracts were adopted at general meetings of the people of the respective Cities . . . to allow plaintiff to act on behalf of the Cities" is clearly erroneous and must be reversed.

In addition, as we can find no evidence that a contractual relationship existed between the Community of Point Hope and Paul, we conclude that the trial court was clearly erroneous in finding the City of Point Hope liable for Paul's fee and accordingly reverse that finding on factual grounds as well.

## IV

■ Paul asserts in his cross-appeal that he should have been awarded a higher fee. He makes numerous arguments urging that his fee was improperly limited to an hourly rate by the trial court, and that his award did not realistically reflect the true value of his services as measured by the benefits that have accrued as a result of the formation of the North Slope Borough.

No one has disputed the magnitude of the social, political and economic benefits that the home rule borough has brought about. The unrefuted testimony in this case demonstrates that prior to the Borough's incorporation, in the words of one witness:

> the area was very much characterized by poverty, inadequate social services, lack of economic base for the people, inadequate health services, inadequate educational facilities and services, inadequate transportation, [and] generally [a] very low level of social and economic development . . . by western standards.

> . . . [T]he predominant organization was one of local village work, . . . and characterized mostly be family relationships and a cooperative type existence in pursuit of subsistence activities and [a] general [subsistence] lifestyle.

The emergence of a borough has brought significant changes to the North Slope. Through the tax revenues gained from the Prudhoe Bay oil development, borough residents are now served by a broad array of health, education, and public safety services.

Despite the possibility that the benefits received in part from Paul's efforts may indeed be, as one expert has opined, beyond comprehension, we cannot say that the trial court's award of a $125.00 per hour fee was

clearly erroneous. We decline to disturb the court's decision and Paul's $125.00 hourly rate of compensation stands.

## V

The last question for our determination concerns the award of attorney's fees to Paul for the litigation of this case. Alaska Rule of Civil Procedure 82(a)(1) sets forth a presumptive schedule of attorney's fees based on the amount of recovery involved. Subsection (2) adds that:

[I]n actions where the money judgment is not an accurate criteria [sic] for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.

In this case the trial judge concluded that the money judgment was not an accurate criterion for establishing the appropriate fee. He stated:

Regarding attorneys' fees this court finds that the money judgment rendered is not an accurate criteria for determining the fee pursuant to Civil Rule 82(a)(2). Due to the difficulty of preparation, the length of time spent in trial, the voluminous research and total duration of litigation the court finds plaintiffs' Alaska counsel and associated out of state counsel should be awarded fees as requested in the amount of $55,080.51, that amount being deemed reasonable under the circumstances.

ASNA, the Borough and the Cities claim that the trial court's award of an attorney's fee of $55,080.51 is an award of a full attorney's fee and that under decisions such as *Davis v. Hallett*, 587 P.2d 1170, 1171 (Alaska 1978) and *Malvo v. J. C. Penney Co.*, 512 P.2d 575, 587 (Alaska 1973), in the absence of a bad faith defense or vexatious conduct, full attorney's fees may not be awarded.

However, the trial court's award was not of a full attorney's fee in the sense prohibited by our cases. Paul's attorneys, apparently motivated by considerations of professional courtesy,[6] charged him for their services at the rate of $30.00 per hour rather than the more usual rate for such services, which, they maintain would be approximately $75.00 per hour. In *Gregory v. Sauser*, 574 P.2d 445 (Alaska 1978) we held that a client's absence of obligation to pay for legal services rendered does not preclude an award of attorney's fees under Civil Rule 82. Under the authority of that decision, the court would be justified in valuing Paul's attorney services using a customary hourly rate. Awarding some fraction of the result would not necessarily conflict with the purposes of Civil Rule 82.

We need not answer whether the $55,080.51 award of attorney's fees was manifestly unreasonable, because under our decision today we have required that the underlying judgment be reduced by nearly half. This change requires that attorney's fees be vacated and recalculated. Ordinarily that task would be left to the superior court. However since the trial judge, the Honorable Peter J. Kalamarides, is now deceased, we shall set attorney's fees, rather than impose that duty on a judge who is unfamiliar with this case. In doing so we defer to the determination of the trial judge that more than scheduled attorney's fees are justified by the difficulty, duration, and complexity of this case. Accepting that, we find a $20,000.00 award to be appropriate.

The decision of the superior court is hereby affirmed in part; reversed in part; and remanded for an order to be entered in accordance with this decision.[7]

CONNOR, J., not participating.

---

6. *See* Ethical Consideration 2–18 of the Code of Professional Responsibility:

It is a commendable and long-standing tradition of the bar that special consideration is given in the fixing of any fee for services rendered a brother lawyer or a member of his immediate family.

ABA Canons of Professional Ethics, No. 2–18.

7. We find it unnecessary to address any of the parties' other contentions. We have considered them and find them to be without merit.