*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CODY LEE and STACEY DEAN, | ) | |
| | ) | Supreme Court Nos. S-14503/14524 |
| Appellants and | ) | |
| Cross-Appellees, | ) | Superior Court No. 3AN-08-09772 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| BARBARA KONRAD, | ) | No. 6948 – August 29, 2014 |
| | ) | |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Stephanie E. Joannides and Andrew Guidi, Judges.

Appearances: James B. Wright, James B. Wright & Associates, P.C., Anchorage, for Appellants/Cross-Appellees. Heather L. Gardner, Seattle, Washington, for Appellee/Cross-Appellant.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

Cody Lee and Stacey Dean (collectively referred to as "Lee") and Barbara Konrad dispute the boundary between their lots in an Anchorage subdivision. Lee insists that the boundary line was established by a 1992 survey, which Lee later marked with

fence posts. Konrad argues that a survey she commissioned after purchasing her lot in 2008 disclosed the true boundary and that encroachment of fill material caused by Lee along the fenceline between the lots was a trespass. The superior court concluded that Konrad's survey correctly identified the boundary line and that the fill material encroachment was a trespass. The court issued an order requiring Lee to remove the fill material and erect a retaining barrier to prevent future trespass; it declared Konrad the prevailing party and awarded attorney's fees.

This appeal requires us to consider: (1) whether the superior court correctly determined the boundary between the lots; (2) whether the court erred by concluding that dirt and gravel encroaching onto Konrad's property was a trespass, and, if not, whether the court properly ordered Lee to remove the fill material and construct a retaining wall; and (3) whether the court's attorney's fees award was an abuse of discretion. We conclude that because Lee and Konrad's predecessors agreed to the boundary established by the 1992 survey, and marked that boundary with fence posts in 1999, the boundary between the lots was established by acquiescence. We thus reverse the superior court's boundary line finding. We conclude that the superior court correctly found that the fill material encroaching onto Konrad's property after she purchased her lot was a trespass. But the court erred by ordering Lee to remove fill material that encroached onto the property before Konrad purchased it because this fill material was not a trespass as to Konrad. We also hold that it was an abuse of discretion to order Lee to pay for construction of a retaining wall to prevent future encroachment. Because this opinion affects the superior court's prevailing-party analysis, we vacate the award of attorney's fees and remand for redetermination of prevailing-party status and recalculation of attorney's fees; we also note that when it calculated attorney's fees, the superior court applied an erroneous rate for Konrad's attorneys.

## II. FACTS AND PROCEEDINGS

### A. Facts

Shelikof Subdivision is situated south of Dowling Road and west of Lake Otis Road in Anchorage; it was platted in 1972. The boundary line in dispute in this case separates two properties located on Ivan Drive, Lots 13 and 14 of Block 3 of Shelikof Subdivision. Lot 13 sits south of and uphill from Lot 14; there is a gradual slope from Lot 13 to Lot 14.[1]

In 1989 Cody Lee purchased Lot 13 on Ivan Street under a warranty deed that incorporated the 1972 plat. Lot 14 was owned and occupied by Jack and Jerrie Southern at the time. In 1992 the Southerns hired surveyor Ken Lang to mark their property line. Lang did not provide the Southerns with records or a written explanation of the survey, but he marked Lot 14's corners with stakes labeled with his license number. The survey was largely consistent with the parties' historical usage, though it indicated that the Southerns' flower bed partially crossed the property line onto Lee's property. After the Lang survey, the Southerns remedied this encroachment by moving the flower bed to their side of the property line.

Stacey Dean married Lee in 1997 and moved into his house on Lot 13. In 1999 Lee decided, with the Southerns' permission, to erect a partial fence to mark the property line between Lots 13 and 14. The fence posts were placed consistent with the parties' mutual understanding of the boundary line's location, and Jack Southern offered to help Lee set the fence posts. In an early affidavit Lee estimated the posts were "several inches on [his] side of the line," but a subsequent review of photos and survey reports led him to believe that a greater setback existed. A 1999 aerial photo indicated

---

[1] We attach a rough sketch of the disputed property as an appendix to this opinion.

that the fence posts defined a straight line segment beginning at the rear of Lots 13 and 14 and ending about a third of the distance between the rear and street front of the lots.

In 2003 the Southerns sold Lot 14 to David and Patty Jo Wilson, who in 2006 sold the property to their daughter, Sherrie Wilson.[2] The Wilsons and Lee treated the boundary line marked by the fence posts as the true property line without any dispute. Sherrie Wilson stated that she believed the property line extended along her side of the fence line to a light pole on the street.

In 2005 or 2006 Lee excavated a basement crawlspace under his home and placed the fill in his backyard next to the fence posts. Lee approached Sherrie Wilson at the time to inform her that "as [he] placed [the] fill, the slope was tending to partially come onto . . . her side of the property line"; Lee offered to "make it better" if she was concerned about the fill. Wilson stated that she was never bothered by the fill, and did not object or ask Lee to remove it.

Lee did not complete the fence until 2007, eight years after he first erected the fence posts, and 15 years after the 1992 Lang survey. The completed fence followed a straight line from the rear of the lots to about halfway down the common property line, at which point it curved into Lot 13 to abut Lee's house. In 2007 Lee "straightened" approximately 16 feet of the curved fence so that it no longer wrapped back to the house.

In 2008 Sherrie Wilson sold Lot 14 and a mobile home on the property to Barbara Konrad. Wilson sold both "as-is" and "did not represent to [Konrad] or any realtor or buyer any boundary inconsistent with the boundary" marked by the fence. Wilson and Konrad did not discuss the boundary line, nor did they discuss who owned the fence between Lots 13 and 14.

---

[2]    Sherrie Wilson lived on Lot 14 during the time it was owned by David and Patty Jo Wilson.

Later that year, Konrad hired John Schuller of ArcTerra Engineering & Surveying to survey her property. Schuller did not locate any monuments[3] on Lot 14, but he did find rebar markers defining three of the four corners of Lot 14. Schuller was unable to locate the fourth corner (the corner at the street front of the boundary between Lots 13 and 14), so, using as reference points rebar markers on the lot and monuments along Ivan Drive and across the street, he placed his own rebar marker to define the street front corner between Lots 13 and 14.

Lee and Dean owned a construction company, and Dean served on the local Zoning and Planning Board; Lee considered Dean and himself to be familiar with land surveying techniques. Believing that Schuller's rebar marker improperly defined the street front corner, Lee removed the marker, thereby destroying the value of the survey.[4]

On June 4, 2008, Konrad wrote a letter to Lee informing him that she intended to have a permanent marker set to mark the survey; Konrad threatened to pursue legal action if Lee removed this marker. The following day Lee responded with a letter explaining why he believed Schuller's survey was erroneous:

> Your surveyor did not do a full survey by pulling from monuments at the corners of the Shelikof subdivision. Those monuments were placed before determining the lot locations . . . . The only way to determine where the true corners of the property [are] is to pull not from existing rebar, but from the monuments that determined the original survey in 1972.

---

[3] In the context of a land survey, a "monument" means "(A) a United States public land survey monument; (B) an Alaska state land survey primary monument; (C) an exterior primary monument controlling a recorded survey; (D) a geodetic control monument established by a state or federal agency." AS 34.65.100(3).

[4] According to Lee, he first talked to Konrad and offered to "split a survey with her so that [they] could resolve this without going to court," but she declined to accept his offer, so he removed the marker.

Lee suggested that he would be willing to move his fence if "a reputable surveyor using the Boundary Survey method of going back to the monuments" determined that the fence encroached on Konrad's property.

Notwithstanding Lee's letter, Konrad hired Schuller to resurvey the land for another fee. Schuller recalculated the position and determined that the corner was actually three to four inches to the south of where his first survey located it. Schuller marked the corner accordingly. This time Lee did not remove Schuller's rebar marker, but he did remove a wooden lattice that Schuller used as an additional survey marker.

Lee subsequently hired Lantech, Inc., a land and construction survey firm that had previously performed work for Lee and Dean's construction company, to conduct a lot stake survey of Lot 13. Lantech found the fourth survey marker placed by Ken Lang in 1992 that Schuller had been unable to find. Lantech's survey revealed "conflicting corner monumentation for the lots that front along the west side of Ivan Drive," including Lots 13 and 14. In order to determine the true record position of the lot corners, Lantech surveyed the original subdivision boundary along East 68th Avenue, the existing centerline road control, and several other lot corners within the subdivision. Lantech determined that the front corner was slightly to the northwest of the corner location determined by Schuller's survey and just to the south of Lang's rebar marker but roughly consistent with the fence separating Lots 13 and 14.

In August 2008 Lee sent Konrad and her attorney a copy of the Lantech survey. He demanded that "[s]ince [Konrad's] as built [survey was] determined to be incorrect," Konrad should: (1) relinquish any claim to his property and acknowledge that the fence properly marked the boundary line; (2) direct Schuller to remove his stakes; (3) refund him the $2,800 cost of the lot stake survey; (4) make no further claims on his property; and (5) pay for any and all attorney's fees. Konrad's attorney responded

four days later by requesting that Lee "remove the fence from [Konrad's] property at his expense."

B.    Proceedings

Lee filed suit in superior court in August 2008.  He sought "[a]n award of declaratory relief serving to quiet title and remove any cloud on that title as between the parties"; a temporary injunction pending resolution of the lawsuit; monetary damages; and costs and attorney's fees.  Konrad counterclaimed and requested costs of her survey; "injunctive relief stopping the trespassers, removing the fence and quieting the title"; and attorney's fees and costs.

Lee subsequently amended his complaint, asserting that because the fence posts marking the boundary were set in 1999, almost nine years before the commencement of the lawsuit, he had established "a prima facie case for adverse possession under claim of title."  Konrad responded and asserted a trespass counterclaim, alleging that Lee had "now built a fence and put in an elevated gravel pad," causing rocks and gravel to continuously "roll off the pad and trespass into Konrad's yard."  Lee acknowledged that construction of the fence was completed while the lawsuit was pending, but denied having installed an elevated gravel pad.  Lee also "[a]dmitted that a small amount of gravel may have 'trespass[ed] into Konrad's yard,' but denied that this caused Konrad any harm."

The parties moved for summary judgment on the boundary by acquiescence, adverse possession, and trespass claims.  Lee also requested that the superior court "declare the law of the case" by finding the Lantech survey proper as a matter of law.  In May 2010 the superior court issued an order on the parties' motions.

The superior court found that Lee successfully acquired "the portion of the disputed area encompassed by [the] 2007 fence" by adverse possession, but that his "claim fails as to the street front portion of the disputed area."  The court also denied

Lee's motion to declare the law of the case, concluding that a genuine issue of material fact existed regarding the historical use of the property. The court further considered whether the boundary had been established by agreement, and found that Lee "create[d] an issue of material fact as to whether the historical property owners[] treated any particular line as an agreed upon boundary line." The court therefore determined that Lee was "not entitled to judgment as a matter of law under the equitable doctrine of mutual recognition and acquiescence, because [he had] not met [his] burden to show by clear and convincing evidence the existence of a clear and certain line that is sufficiently defined." Finally, the superior court declined to rule on issues relating to the surveys, instead leaving these issues for trial.

The court also addressed Konrad's trespass claim. It concluded that Wilson's consent to the gravel/fill encroachment gave Lee a revocable license to trespass on her land, but this license was terminated when Konrad bought the property or when she raised the issue of trespass in the lawsuit. The court further found that although Konrad had established a continuing trespass, Lee's liability was "simply that of removal," such that once a legal boundary was officially established, he would be required to "remove the encroachment and ensure no further encroachment . . . by building a retaining wall or otherwise."

The superior court held a three-day trial in June 2010. The majority of the trial testimony focused on the survey methods used in the two recent, competing surveys by Lantech and Schuller. On January 10, 2011, the superior court issued its decision. The court first made general findings before addressing the boundary line at issue. The court concluded that because Schuller took into consideration the existing use of surrounding properties, his method was more reliable. The court therefore concluded that Schuller's survey correctly identified the property line between Lots 13 and 14. The

court did not address or make any findings on whether the boundary line may have been established by agreement between Lee and Konrad's predecessors.

In final orders issued in June and August 2011,[5] the superior court ordered Lee to: (1) pay Schuller all necessary costs for a resurvey; (2) "remove all encroaching fill, existing fence and any other material . . . placed on Lot 14"; (3) construct an adequate retaining wall, the proposed design of which would be reviewed by a construction company selected by Konrad; (4) bear "[a]ll costs of fill and fence removal[,] as well as costs for construction, design and review of design for the retaining wall"; and (5) "restore the encroached-upon land to an orderly state."

The court declared Konrad the prevailing party and found that the reasonable value of Konrad's attorneys' services was $55,000, utilizing an hourly rate of $250 and $350 respectively for Konrad's two attorneys. The court then awarded Konrad 30% of these fees pursuant to Alaska Civil Rule 82(b)(2), for a total of $16,500. But the court declined to award Konrad an enhanced fee award on the basis of her Alaska Civil Rule 68 offer of judgment. The court reasoned that Konrad had made her offer to both Lee and Dean, but Dean did not own the property and therefore "could not have bound [Lee] to a change in the property line." The court therefore determined that because "the offer was conditioned on acceptance by both offerees," it was invalid.

Lee and Dean appeal. Konrad cross-appeals on the adverse possession claim and the denial of an enhanced attorney's fee award.

---

[5] The case was reassigned from Judge Stephanie E. Joannides to Judge Andrew Guidi in April 2011. Judge Guidi issued the final judgment and presided over the post-trial motions.

## III.  STANDARDS OF REVIEW

"We review legal questions de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[6]  Factual findings are reviewed for clear error.[7]  "We will reverse the trial court's factual findings only when, 'after a review of the entire record, we are left with a definite and firm conviction that a mistake has been made.' "[8]

We have not considered a boundary line dispute of the type at issue here. We observe, however, that the determination of a disputed boundary often presents a compound issue involving questions both of law and fact.[9]  The relative weight of different types of evidence of disputed boundaries ordinarily presents a question of law, but the credibility of witnesses, including the weight given the opinions of surveyors, the location or existence of physical markers, and the timing of events, are questions of fact.[10]

Equitable injunctive relief is an extraordinary remedy that is appropriate only where the party requesting relief is likely to otherwise suffer irreparable injury and

---

[6]  *Estate of Smith v. Spinelli*, 216 P.3d 524, 528 (Alaska 2009) (internal quotation marks and alterations omitted).

[7]  *Peterson v. Ek*, 93 P.3d 458, 463 (Alaska 2004).

[8]  *Id.* (quoting *Demoski v. New*, 737 P.2d 780, 784 (Alaska 1987)).

[9]  *See Hansen v. Stewart*, 761 P.2d 14, 16 (Utah 1988).

[10]  *See id.* ("[Legal] rules specify . . . the relative weight to be given various types of evidence that may be used to determine the location of a boundary.  For example, natural landmarks are generally preferred over artificial monuments . . . .  On the other hand, the determination of factual questions may also be important in boundary cases.  For example, whether a specific event occurred or where a particular marker is located may be critical." (internal citations omitted)).

lacks an adequate remedy at law.[11] We review the superior court's decision to grant or deny injunctive relief for abuse of discretion.[12] "Abuse of discretion exists 'if the [order] is arbitrary, capricious, manifestly unreasonable or the result of an improper motive.' "[13] An award of attorney's fees, including a superior court's prevailing-party determination, is also reviewed for abuse of discretion.[14] We review de novo whether the superior court applied the law correctly in awarding attorney's fees.[15]

---

[11] *Cf. Carrol v. El Dorado Estates Div. No. Two Ass'n, Inc.*, 680 P.2d 1158, 1160 (Alaska 1984) ("Where a statute specifically authorizes injunctive relief, the plaintiff need not show either irreparable injury or lack of an adequate remedy at law." (citations omitted)); *see also, e.g.*, *Sharp v. 251st St. Landfill, Inc.*, 925 P.2d 546, 549 (Okla. 1996) ("An injunction is an extraordinary remedy that should not be lightly granted." (citations omitted)); *Grimes v. Enter. Leasing Co. of Philadelphia, LLC.*, 66 A.3d 330, 340 (Pa. 2013) ("Injunctive relief is considered an extraordinary equitable remedy and it is to be granted only where the . . . party [seeking injunctive relief] has established that immediate and irreparable harm, which cannot be compensated by damages, will result if the injunction is denied. Furthermore, the party seeking to enjoin certain conduct must demonstrate that greater injury would result by refusing the injunction than by granting it." (alterations in original) (internal quotation marks and citations omitted)).

[12] *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184 (Alaska 2008) (citing *Betz v. Chena Hot Springs Grp.*, 657 P.2d 831, 837 (Alaska 1982)).

[13] *Weilbacher v. Ring*, 296 P.3d 32, 37 (Alaska 2013) (quoting *Hughes v. Foster Wheeler Co.*, 932 P.2d 784, 793 (Alaska 1997)).

[14] *Id.* (citing *Hopper v. Hopper*, 171 P.3d 124, 129 (Alaska 2007)); *Taylor v. Moutrie-Pelham*, 246 P.3d 927, 929 (Alaska 2011) (citing *Fernandes v. Portwine*, 56 P.3d 1, 5 (Alaska 2002)).

[15] *Beal v. McGuire*, 216 P.3d 1154, 1162 (Alaska 2009) (citing *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001)).

## IV.    DISCUSSION

### A.    The Boundary Line Dispute

Lee asserts that: (1) the superior court selected the incorrect property line, disregarding established principles of boundary law and the historic expectations of the property owners; (2) Lee and Konrad's predecessors all recognized the same line as the dividing boundary line, such that Lee laid claim to the property under the doctrine of boundary by acquiescence; and (3) the superior court improperly applied a new standard for adverse possession at trial after deciding the adverse possession issue on summary judgment. Lee argues that "the primary error in the case was the superior court's treatment of the undisputed history of usage at the boundary between Lots 13 [and] 14." Lee "ask[s] [this] court to recognize the law of practical location, by whatever name (practical location, boundary by agreement, by acquiescence, or by estoppel),[16] based on the undisputed 16+ year history between 1992 and 2008." Specifically, Lee asserts

---

[16]    Lee also frequently refers to the applicable doctrine as the "Cooley doctrine," apparently relying on the view expressed by Justice Thomas Cooley's concurring opinion in *Diehl v. Zanger*, 39 Mich. 601 (Mich. 1878). Justice Cooley expanded on this topic in a widely acclaimed and republished paper. *See* Herbert W. Stoughton, *Thomas McIntyre Cooley and the Judicial Functions of Surveyors*, ACSM BULLETIN No. 155 (May/June 1995); Kristopher M. Kline, *How to Fix a Boundary Line*, THE TARHEEL SURVEYOR No. 13.2 at 22 (Fall 2013) ("Several states recognize practical location as a variant allowing consideration of fence lines as the best available evidence of the original location of the boundary — this is sometimes referred to as the 'Cooley Doctrine.' "). Most modern legal treatises and courts, however, refer to the doctrine under which a boundary line may be determined by the practical agreement or acquiescence to a particular line as "boundary by acquiescence" or "recognition and acquiescence." *See e.g.*, 9 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 68.05 (1997) (mutual recognition and acquiescence); WALTER G. ROBILLARD & LANE J. BOUMAN, CLARK ON SURVEYING AND BOUNDARIES § 20.03, at 672 (7th ed. 2009) (boundary by acquiescence). We adopt the concise and accurate term "boundary by acquiescence."

-12-                                                            6948

that "[t]he undisputed evidence of historical use and reliance" demonstrates that from 1992 to 2008 the adjacent landowners consistently agreed that the 1992 "Lang line" marked the property line between Lots 13 and 14.

Konrad responds that Lee has not shown that the superior court erred in its factual determination of the boundary line based on its review of the survey techniques used. Konrad also cross appeals, arguing in part that the court erred in granting summary judgment to Lee on his adverse possession claim.

For the reasons discussed below, we conclude that the boundary line was conclusively established by acquiescence of the owners of Lots 13 and 14 to the 1992 Ken Lang survey line. Accordingly, we need not consider the parties' other points on appeal regarding the surveyed locations of the boundary line and adverse possession.

### 1. The doctrine of boundary by acquiescence

Boundary by acquiescence is an equitable gap-filling doctrine that may be available where estoppel and adverse possession are unavailable.[17] While the exact requirements of the doctrine vary from state to state,[18] Justice Thomas Cooley of the Michigan Supreme Court aptly summarized the doctrine as follows: "The long practical acquiescence of the parties concerned, in supposed boundary lines, should be regarded as such an agreement upon them as to be conclusive even if originally located erroneously."[19] Boundary by acquiescence is "a rule of repose, with a view to the

---

[17] *See* 9 POWELL, *supra* note 16, § 68.05(1)(c).

[18] *Id.* § 68.05[2] ("The gap-filling role played by the doctrine of recognition and acquiescence ensures there is no accurate single or simple formulation of the doctrine."); *see* ROBILLARD, *supra* note 16, § 20.03, at 294 (Supp. 2010) (noting lack of agreement on precise contours of the doctrine).

[19] *Diehl*, 39 Mich. at 606 (Cooley, J., concurring); *see also Joyce v. Williams*, (continued...)

quieting of titles," which rests upon the "sound public policy . . . of preventing strife and litigation concerning boundaries."[20]

One leading treatise describes "[a] general consensus of opinion from those courts that have considered the creation of a boundary by acquiescence" that the doctrine has three requirements: (1) the existence of a present "dispute from which it can be implied that both parties are in doubt as to the location of the true boundary"; (2) "[a] continued occupation and acquiescence in a line other than the true boundary"; and (3) "[u]se for a period of time of more than the statutory period required for adverse possession."[21]

Most courts also require a claimant to prove that a physical, visible marker actually establishes the purported property line, though what constitutes a sufficiently marked line varies considerably. For example, New Mexico's approach, which the superior court relied on in its summary judgment order, requires: "(1) adjoining landowners (2) who occupy their respective tracts up to a clear and certain line (such as a fence), (3) which they mutually recognize and accept as the dividing line between their properties (4) for a long period of time."[22] In Maine a party seeking to prove boundary by acquiescence must prove "possession up to a visible line marked clearly by

---

[19](...continued)
26 Mich. 332, 337-38 (1873) (holding that boundary line was established by "continued acquiescence" to a boundary earlier agreed upon by the parties, as evidenced by "subsequent acts and improvements, and continued occupancy on the faith of [the line]").

[20]     *Holmes v. Judge*, 87 P. 1009, 1014 (Utah 1906) (internal quotation marks omitted).

[21]     ROBILLARD, *supra* note 16, § 20.03, at 669 (citing *Campbell v. Noel*, 490 So. 2d 1014 (Fla. Dist. App. 1986)).

[22]     *Cauble v. Beals*, 631 P.2d 1311, 1312 (N.M. 1981) (alterations omitted) (quoting *Tresemer v. Albuquerque Pub. Sch. Dist.*, 619 P.2d 819, 820 (N.M. 1980)).

monuments, fences or the like."[23]  The Supreme Judicial Court of Maine affirmed findings that survey pins[24] and an old roadway[25] created a sufficiently visible line, but held the unmarked edge of a periodically mowed hayfield insufficient.[26]  The Utah Supreme Court held that a party must prove "occupation up to a visible line marked by monuments, fences or buildings"[27]; this requirement "may be satisfied where land up to the visible, purported boundary line is farmed, occupied by homes or other structures, improved, irrigated, used to raise livestock, or put to similar use."[28]  In Washington, a party asserting that a boundary line was established by mutual recognition and acquiescence must prove "that the boundary line between two properties was 'certain, well[-]defined, and in some fashion physically designated upon the ground, e.g., by monuments, roadways, fence lines, etc.' "[29]  The Washington Supreme Court held that three widely-spaced survey markers set in a thicket of blackberry bushes, ivy, and weeds, were insufficient to establish a clear and well-defined boundary.[30]  The Iowa Supreme Court defined acquiescence as "the mutual recognition by two adjoining landowners for

---

[23]     *Anchorage Realty Trust v. Donovan*, 880 A.2d 1110, 1112 (Me. 2004) (citing *Dowley v. Morency*, 737 A.2d 1061, 1067 (Me. 1999)).

[24]     *Dupuis v. Soucy*, 11 A.3d 318, 323 (Me. 2011).

[25]     *Marja Corp. v. Allain*, 622 A.2d 1182, 1185 (Me. 1993).

[26]     *Crosby v. Baizley*, 642 A.2d 150, 154 (Me. 1994), *superceded on other gounds by statute*, ME. REV. STAT. § 810-A (2009).

[27]     *Fuoco v. Williams*, 421 P.2d 944, 946 (Utah 1966).

[28]     *Bahr v. Imus*, 250 P.3d 56, 65 (Utah 2011) (citation omitted).

[29]     *Merriman v. Cokeley*, 230 P.3d 162, 164 (Wash. 2010) (quoting *Lamm v. McTighe*, 434 P.2d 565, 569 (Wash. 1967)).

[30]     *Id.* at 165.

ten years or more that a line, definitely marked by fence or in some manner, is the dividing line between them."[31] The Iowa Court affirmed a finding that boundary by acquiescence was established where the boundary was marked by just three fence posts, reasoning that "[a]lthough the boundary line claimed . . . is not marked by a fence or some other consistently solid barrier, the three posts represent a distinct division of the parties' properties."[32]

There is little functional difference between the various formulations of the standard for establishing a boundary line by acquiescence. We agree with the New Hampshire Supreme Court that "boundary by acquiescence is grounded 'upon principles of public policy that preclude a party from setting up or insisting upon a boundary line in opposition to one which has been steadily adhered to.' "[33] Given that rationale for the doctrine, it makes little sense to rigidly limit the way in which agreement to a boundary line can manifest. To that end, we do not attempt to define the minimum extent to which a line must be established by physical markers. But we observe that it is difficult to conceive how parties could prove agreement to a boundary line without some physical markers indicating the line's location. Accordingly, we hold that a boundary line is established by acquiescence where adjoining landowners (1) whose property is separated by some reasonably marked boundary line (2) mutually recognize and accept that boundary line (3) for seven years or more.[34]

---

[31]     *Ollinger v. Bennett*, 562 N.W.2d 167, 170 (Iowa 1997) (quoting *Sille v. Shaffer*, 297 N.W.2d 379, 381 (Iowa 1980)) (internal quotation marks omitted).

[32]     *Tewes v. Pine Lane Farms, Inc.*, 522 N.W.2d 801, 806 (Iowa 1994).

[33]     *O'Hearne v. McClammer*, 42 A.3d 834, 839 (N.H. 2012) (quoting *Richardson v. Chickering*, 41 N.H. 380, 384 (1860)) (alterations omitted).

[34]     For consistency we adopt the seven-year statutory prescriptive period for
(continued...)

**2.** **The superior court erred by failing to consider Lee's trial evidence and argument that the boundary between Lot 13 and Lot 14 was established by acquiescence.**

In its summary judgment order the superior court considered what it called "the doctrine of mutual recognition and acquiescence" in some detail. The court concluded that Lee was not entitled to judgment as a matter of law, finding that "[w]hile evidence suggests the property owners may have recognized land to the lot 13 side of the fence posts as Plaintiffs', there is no clear and convincing evidence that a definite line otherwise existed, especially with regard[] to the street front portion of the lots." In essence, the court denied Lee's motion for summary judgment because it found there was a genuine issue of material fact. Thus, if the court was correct in finding a genuine issue of material fact, the issue should have been resolved at trial. But the superior court did not revisit the boundary by acquiescence issue in its trial decision; instead, it focused almost entirely on the merits of the competing survey techniques.

The theory that the boundary line should be established based on the longstanding understanding and agreement between Lee and the previous owners of

---

**34**(...continued) adverse possession under color and claim of title, AS 09.45.052(a), as the time period required to establish boundary by acquiescence. But we note that boundary by acquiescence and adverse possession are fundamentally distinct legal doctrines. Boundary by acquiescence arises from some of the same policy considerations as adverse possession, but rather than creating a means whereby a party can acquire title to land without the other owner's consent, it allows parties to establish the location of a boundary by consent, but without written agreement. *See* James H. Backman, *The Law of Practical Location of Boundaries and the Need for an Adverse Possession Remedy*, 1986 B.Y.U. L. REV. 957, 958-967 (1986). Adverse possession requires "uninterrupted adverse notorious possession of real property under color of claim for seven years or more." AS 09.45.052(a). By contrast, boundary by acquiescence does not require possession to be adverse; it requires the opposite: mutual acquiescence to possession. ROBILLARD, *supra* note 16, § 20.03, at 672.

Lot 14 was raised and supported at trial. Lee's closing argument included a discussion of the "Ken Lang line." This line was the property line as determined by a 1992 survey commissioned by Konrad's predecessors in interest and agreed to by Lee and Konrad's predecessors in interest, and was marked by the fence posts which Lee erected in 1999. Lee argued that this line was accepted as the undisputed property boundary by all of Lot 14's owners prior to Konrad. His argument was supported by the testimony of Sherrie Wilson, who owned Lot 14 from 2003-2008. It was supported by the trial testimony of Jerrie Southern, who lived at Lot 14 from the early 1990s to 2000, and who hired Ken Lang in 1992 to perform the survey giving rise to the agreed-upon boundary line. And it was supported by Lee's trial testimony.

Because the boundary by acquiescence issue was not decided in the court's summary judgment order and was raised and argued at trial, the court erred by failing to consider whether the boundary line was established by the adjacent lot owners' acquiescence to the 1992 Ken Lang survey line.

### 3. The boundary between Lots 13 and 14 was conclusively established by acquiescence to the 1992 Ken Lang survey line.

As we have discussed, the boundary line claimed by Lee was first established in 1992 when Ken Lang surveyed Lot 14. In 1999 Lee set fence posts according to Lang's survey markers, though he explained that he "held them back on [his] side of the property line" so as to avoid "issues with the neighbor." Jerrie Southern and Lee both stated that the fence posts were placed consistent with the parties' mutual understanding of the boundary line — indeed, Jack Southern offered to assist Lee in placing the fence posts. Lee and the Southerns never disputed the location of the boundary between their properties. Wilson testified that, although she did not know the exact location of the property line because "[i]t didn't really matter" to her, she never had any dispute with Lee about its location. She further stated that "[a]t all relevant times I

believed that the property line extended along my side of Cody and Stacey's fenceline out to near the streetlight."

The basic requirements for boundary by acquiescence are established by undisputed evidence in this case: the boundary line between Lots 13 and 14 was definitely marked by rebar survey markers placed by Ken Lang, fence posts,[35] and later a fence, and the owners of the adjacent lots mutually recognized and accepted that boundary line for more than seven years. To the extent that the fence posts were the visible marker of the boundary line, that line clearly extended to the front of the property. There is no dispute that the boundary line between the properties is a straight line. Indeed, the 1972 subdivision plat clearly shows that the line is straight. And given the relatively short distance from the back to the front of the lots, there could be no confusion about continuation of the straight line established by the fence posts to the front of the property.

We conclude that the boundary line between Lots 13 and 14 was conclusively established by Lee's and Konrad's predecessors' undisputed acquiescence to the 1992 Ken Lang survey line during the period between 1992 and 2008. Thus, the superior court's decision accepting the Schuller survey as the applicable boundary was erroneous and we reverse.

B.    The Trespass Claim

In 2005 or 2006 Lee excavated a basement crawlspace under his home and placed the fill next to the fence posts in his back yard. Lee's lot is upslope of Lot 14, and

---

[35]    Lee apparently set the fence posts back a few inches from the Lang property line in order to avoid any possible disputes with his Lot 14 neighbors. The record indicates that the owners of Lot 14 recognized that the boundary line was consistent with the fence posts but that the fence posts themselves were set back slightly on Lot 13.

Lee approached Sherrie Wilson at the time to inform her that "as [he] placed [the] fill the slope was tending to partially come onto . . . her side of the property line." Lee offered to "make it better" if she was concerned about the fill. Wilson stated that she was never bothered by the fill and did not object or ask Lee to remove it. Lee did not remove any fill material that had encroached onto Lot 14 before Konrad purchased the property. Lee admitted that some material "may" have continued to move onto Lot 14 after Konrad purchased it. Konrad alleged that the encroachment both before and after she purchased Lot 14 was a trespass.

In its summary judgment order, the superior court defined the issue presented by the trespass claim as "whether an implied consent to a gravel/dirt fill encroachment given by a predecessor in interest precludes a landowner from [bringing] a trespass action." The court concluded that it did not: it found that the encroachment was a continuing trespass because the gravel/dirt fill remained on Konrad's property, and that Wilson's consent to the encroachment was a revocable license that was terminated when Konrad bought the property or when she raised the issue of trespass in litigation. The court further ruled that Konrad had standing to raise a continuing trespass claim and that Konrad need not establish damages as part of her trespass claim.

Lee argues on appeal that Konrad's trespass claim "should fail as a matter of law because . . . Konrad did not own or possess Lot 14 in 2005-2006" when gravel spilled across the property line and "the 'offense' was not considered such by those who then owned the property, [who] consent[ed] to it."[36]

---

[36] Lee also contends that Konrad's trespass claim was 'so trivial' that she was unable to allege any resulting damage with the specificity required by Alaska Civil Rules 9(h) and 26(a)(1)(G). But a trespasser may be liable for nominal damages even if "his presence on the land causes no harm to the land," *Brown Jug, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local 959*, 688 P.2d 932, 938
(continued...)

For the reasons discussed below, we conclude that the superior court erred to the extent it concluded that Lee's fill material that encroached on Wilson's lot before Konrad purchased the lot constituted a continuing trespass. The court also erred by ordering Lee to remedy any injury caused by fill material placed on Lot 14 with Wilson's consent before Konrad purchased the property. We further conclude that the superior court properly ordered Lee to remove any material that encroached onto Lot 14 after Konrad purchased the property and to prevent future encroachment, but that it was an abuse of discretion to order Lee to pay for the construction of a retaining wall.

### 1. The encroachment of fill material before Konrad purchased Lot 14 was not a trespass.

A "[t]respass is an unauthorized intrusion or invasion of another's land."[37] Consent is generally considered to be an affirmative defense to trespass.[38] Indeed, "consent marks a deficiency in the plaintiff's prima facie case at the most fundamental level; where the plaintiff consents, the defendant's act is simply not tortious."[39]

Wilson consented to the fill material's encroachment onto her property. The superior court characterized Wilson's consent as implied consent, and we agree because

---

[36](...continued) (Alaska 1984) (quoting RESTATEMENT (SECOND) OF TORTS § 163 (1965)), thus the viability of Konrad's trespass claim does not depend on the specificity of her damage allegations.

[37] *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 539 (Alaska 2001) (citing *Parks Hiway Enters., L.L.C. v. CEM Leasing, Inc.*, 995 P.2d 657, 664 (Alaska 2000); RESTATEMENT (SECOND) OF TORTS §§ 158, 163).

[38] RESTATEMENT (SECOND) OF TORTS §§ 167-175; 1 DAN B. DOBBS, PAUL T. HAYDEN & ELLEN M. BUBLICK, THE LAW OF TORTS § 105, at 317-18 (2d ed. 2011) (citations omitted).

[39] 1 DOBBS, *supra* note 38, § 105, at 318 (citations omitted).

Wilson's undisputed testimony establishes that at the least, her consent was implied. "If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact."[40] Consent to trespass may be implied from actions or conduct, applicable social conventions, or the relationship between the parties.[41] In this case the undisputed facts are: Lee approached Sherrie Wilson to inform her that "as [he] placed [the] fill, the slope was tending to partially come onto . . . her side of the property line"; Lee offered to "make it better" if she was concerned about the fill. Wilson stated that she was never bothered by the fill, and did not object or ask Lee to remove it.

Because Wilson consented to the spillage of fill material, no trespass occurred while Wilson owned Lot 14. Thus, the superior court erred to the extent it concluded that the initial encroachment caused by Lee's placement of fill material along the property line was a trespass.

On the other hand, when Konrad came into possession of the property, the consent given by Wilson "cease[d] to be effective as conferring a privilege to enter or remain" because "the interest of the licensor in the land [in this case, Wilson,] . . . terminated."[42] In other words, Wilson's consent effectively vitiated Lee's trespass,[43] but

---

[40]    RESTATEMENT (SECOND) OF TORTS § 892 (1979).

[41]    1 DOBBS, *supra* note 38, § 106, at 322-23 (citations omitted).

[42]    RESTATEMENT (SECOND) OF TORTS § 171(c) cmt. f. (1965).

[43]    1 DOBBS, *supra* note 38, § 105, at 318 ("The plaintiff's consent . . . negates any tortious intent, so the plaintiff fails in one element of her proof."); RESTATEMENT (SECOND) OF TORTS § 167 cmt. b ("[A] consent to enter a particular part of the land in a particular manner or at a particular point or for a particular purpose carries with it consent to such harm to the land and to the possessor's interest in the persons and things on the land as is incidental to a careful exercise of the license.").

when Wilson sold her property to Konrad, Konrad started afresh; she had a viable cause of action with respect to any fill material encroachment that may have occurred after she purchased Lot 14, but not with respect to the fill material that Lee had previously spilled onto the property when Wilson owned it.

We also observe that Konrad suffered no injury as a result of encroachment that occurred before she purchased Lot 14. If Konrad had serious objections to purchasing Lot 14 with the previous fill encroachment, she could have conditioned her purchase on Wilson removing the material. But Konrad agreed to purchase the property "as-is" and did not express any concern regarding the presence of the fill material before purchasing Lot 14. In purchasing Lot 14 "as-is," she effectively became the owner of the land that included whatever fill material had spilled onto the land previously. If there was any reduction (or increase) in Lot 14's value based on that encroachment, it presumably was reflected in the purchase price. Konrad got exactly what she purchased — Lot 14 "as-is" — and suffered no injury as a result of the fill material that was on and part of Lot 14 when she purchased the property.

### 2. The material that spilled onto Lot 14 after Konrad purchased it may properly be characterized as a trespass.

The superior court's findings identify two times when fill and gravel spilled onto Lot 14. The first time was "[i]n late 2005/early 2006, [when] Lee raised the level of his backyard with excavated dirt and gravel fill. This resulted in fill and gravel spilling over onto lot 14 and encroach[ing] onto lot 14 by two or three feet. Sherrie Wilson, the then-owner of [Lot 14], did not object to this encroachment." The second time was when, "[i]n addition to the fill Plaintiffs previously placed within their fence from the excavation of their basement, they brought additional fill after the law suit was filed[,] and it has further spilled over onto [Konrad's] property."

To establish a claim of trespass, a plaintiff must prove that she had actual or constructive possession of the property in question at the time the alleged injury occurred.[44] Ordinary trespass "is complete when it is committed";[45] thus a plaintiff who acquires a possessory interest in the property may not recover for a trespass that occurred prior to that possession.[46]

As stated previously, because Wilson consented to the fill material spilling onto her property, the privilege of consent applied to preclude a trespass claim with regard to the material that encroached before Konrad purchased the lot. But in the absence of consent from Konrad, Lee had an obligation to prevent additional fill material from spilling onto Lot 14. Thus, after Konrad purchased Lot 14, Lee's conduct in allowing that encroachment was tortious, and the superior court properly characterized this as a trespass.

> **3. The superior court erred by granting relief for any encroachment of fill material that occurred before Konrad owned Lot 14, but properly granted relief for encroachment that occurred after Konrad purchased the lot.**

As explained above, because Konrad purchased the property after Lee's initial placement of fill material along the property line with Wilson's consent, Konrad suffered no injury due to the initial encroachment of fill material. Thus, Konrad lacked standing to bring a trespass action based on material deposited on Lot 14 before she

---

[44] *Cape Fox Corp. v. United States*, 456 F.Supp. 784, 804 (D. Alaska 1978) (footnote omitted), *judgment reversed in part on other grounds by Cape Fox Corp. v. United States*, 646 F.2d 399 (9th Cir. 1981).

[45] W. PAGE KEATON, PROSSER AND KEATON ON TORTS § 13, at 83 (5th ed. 1984).

[46] *Id.*; *see also* RESTATEMENT (SECOND) OF TORTS § 157.

purchased the lot.[47]  Konrad did have standing, of course, to bring a trespass action for any fill material that spilled onto Lot 14 after she purchased the property.  And Konrad had standing to seek injunctive relief to require Lee to cease all continuing encroachment of the fill material, to remove the fill material that had encroached after Konrad purchased Lot 14, and to prevent any further encroachment.

Ordinarily we review grants of injunctive relief for abuse of discretion.[48] But the superior court's order was premised on the incorrect legal conclusion that Konrad had an actionable trespass claim for the fill material that spilled onto Lot 14 before she purchased the lot.  It was therefore legal error to order Lee to remove the fill material that was already present on Lot 14 when Konrad purchased the property.

The same cannot be said of the fill material that continued to spill onto Konrad's property after she purchased the lot.  We conclude that the superior court did not abuse its discretion to the extent it ordered Lee to cease the continuing encroachment of the fill material, to remove any fill material that encroached onto Konrad's property after she purchased the lot, and to prevent any further encroachment.  However, "injunctive relief should be no more burdensome to the defendant[] than necessary to provide complete relief to the plaintiff[]."[49]  Photographs and diagrams of the encroachment show that all of the material, including whatever spilled onto the property

---

[47]     See KEATON, supra note 45, § 13, at 83 (explaining that plaintiff who acquires title to a property may not recover for an ordinary trespass that occurred prior to her ownership).

[48]     See Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 177 P.3d 1181, 1184 (Alaska 2008) (citing Betz v. Chena Hot Springs Grp., 657 P.2d 831, 837 (Alaska 1982)).

[49]     Richardson v. City of Rutland, 671 A.2d 1245, 1249 (Vt. 1995) (quoting Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994)).

while it was owned by Wilson, only slightly altered the slope of a narrow strip of Lot 14's backyard along the fence line. And the record indicates that continued encroachment, if any, after Konrad purchased Lot 14 was minor. Further, the superior court did not find that a retaining wall was the only way to prevent future encroachment. The superior court judge who conducted the trial concluded that Lee's liability was "simply that of removal" — Lee was required to "remove the encroachment and ensure no further encroachment . . . by building a retaining wall or otherwise." We conclude that requiring Lee to pay a contractor selected by Konrad to approve the design of a retaining wall and construct a retaining wall is an unreasonably burdensome remedy for the encroachment of fill material onto Lot 14 after Konrad purchased the lot. It is sufficient to order Lee to remove the encroaching fill material and ensure no further encroachment will occur. We reverse the superior court's order and remand the trespass issue to the superior court for further proceedings consistent with this opinion.

## C. Attorney's Fees

Alaska Civil Rule 82(a) provides that "the prevailing party in a civil case shall be awarded attorney's fees" unless otherwise provided by law or agreed to by the parties. "The prevailing party is the one who has successfully prosecuted or defended against the action, the one who is successful on the main issue of the action and in whose favor the decision or verdict is rendered and the judgment entered."[50] The prevailing-party determination is within the broad discretion of the trial court.[51]

Because this decision will affect the superior court's prevailing-party analysis, we vacate the court's attorney's fee award and remand for reconsideration of

---

[50] *Taylor v. Moutrie-Pelham*, 246 P.3d 927, 929 (Alaska 2011) (quoting *Progressive Corp. v. Peter ex rel. Peter*, 195 P.3d 1083, 1092 (Alaska 2008)) (internal quotation marks omitted).

[51] *Day v. Moore*, 771 P.2d 436, 437 (Alaska 1989) (citation omitted).

prevailing-party status and recalculation of attorney's fees. We do not reach whether the superior court abused its discretion by finding that Konrad was the prevailing party in the first instance, nor do we address whether the superior court erred by failing to grant Konrad enhanced attorney's fees under Alaska Civil Rule 68. But we do observe that in its calculation of attorney's fees the superior court adopted an erroneous rate for Konrad's attorneys.

As a member of the Alaska Public Employees Association (APEA), Konrad was entitled to receive legal services at a contractually reduced fee rate. Konrad's attorneys contracted with APEA to charge APEA members an hourly rate of no more than $140. But in their motion for attorney's fees, Konrad's attorneys argued that Konrad should receive fees calculated on the value of their "usual" rate, rather than their agreed-upon APEA rate.

In awarding attorney's fees to Konrad pursuant to Rule 82, the superior court, relying on our decisions in *Arctic Slope Native Association v. Paul*[52] and *Krone v. State, Department of Heath and Social Services*,[53] found that "the reasonable hourly value of defense counsels' services [was] $55,000, utilizing a valuation" of $350 per hour for one of Konrad's attorneys and $250 per hour for the other attorney. The superior court interpreted *Arctic Slope Native Association* to mean that "in cases where the attorney charges no fee or a reduced rate, the proper approach is to value the attorney's services and to make a [Rule] 82 award which is some fraction of that value." The court apparently derived this proposition from *Municipality of Anchorage v. Gentile*, where in

----

[52]    609 P.2d 32 (Alaska 1980).

[53]    222 P.3d 250 (Alaska 2009).

a footnote we briefly summarized *Arctic Slope Native Association* in almost identical language.[54]

In *Arctic Slope Native Association*, attorneys charged a fellow attorney a reduced rate.[55] After the attorney prevailed at trial, the trial court awarded attorney's fees pursuant to Rule 82 and valued the attorneys' services at their customary hourly rate.[56] Noting that the attorneys were "apparently motivated by considerations of professional courtesy," we held that "the trial court's award was not of a full attorney's fee in the sense prohibited by our cases."[57] In *Krone* we applied the aforementioned proposition, as summarized in *Gentile*, to conclude that the superior court should have awarded attorney's fees to public interest class representatives who prevailed on a constitutional challenge by "objectively valu[ing] the attorney's services" even though the attorney provided pro bono services.[58] We held that this objective valuation "might be accomplished simply by multiplying reasonable hourly rates by the actual reasonable

---

[54] *See Municipality of Anchorage v. Gentile*, 922 P.2d 248, 263 n.20 (Alaska 1996) ("In cases where the attorney charges no fee or a lower than usual fee, however, the proper approach is to value the attorney's services and to make a Rule 82 award which is some fraction of this value." (citing *Arctic Slope Native Ass'n*, 609 P.2d at 38)).

[55] *Arctic Slope Native Ass'n*, 609 P.2d at 38.

[56] *Id.*

[57] *Id.* (citing ETHICAL CONSIDERATION 2-18 OF THE CODE OF PROF'L RESPONSIBILITY, ABA CANONS OF PROF'L ETHICS, NO. 2-18 ("It is a commendable and long-standing tradition of the bar that special consideration is given in the fixing of any fee for services rendered a brother lawyer or a member of his immediate family.")).

[58] *Krone*, 222 P.3d at 257 (footnote omitted).

hours worked, or in an appropriate context, by further considering value-enhancing factors such as risk premiums and encouraging representation in similar cases."[59]

Under these cases a court may set a reasonable market rate for pro bono or quasi-pro bono services that are provided, but this case does not involve such services. Unlike in the pro bono context, Konrad's attorneys received a financial benefit for offering the reduced rate: they were able to obtain business they might not otherwise have received had they not participated in the APEA benefits plan. An objective valuation of the attorneys' services should take into account the benefit received by Konrad's attorneys in the form of referrals. In this case the most objective estimation of that rate is simply the rate Konrad's attorneys agreed to accept in exchange for participating in the APEA benefits plan — $140 per hour. The hourly rates adopted by the superior court thus did not represent an objective valuation of the attorneys' services.[60] We conclude that the superior court misapplied Rule 82 in its valuation of Konrad's attorneys' hourly rates.

## V.    CONCLUSION

For the reasons explained above, we REVERSE the superior court's ruling that Schuller's survey defined the boundary line: rather, the boundary line was established by the acquiescence of Lee and Lot 14's owners before Konrad purchased Lot 14. We AFFIRM the superior court's conclusion that Lee is liable for trespass of any fill material that spilled onto Lot 14 after Konrad purchased the lot, but we REVERSE the court's determination that Konrad could state a claim of trespass as to fill material that spilled onto lot 14 prior to Konrad's purchase of the lot. We also REVERSE the court's order of injunctive relief and REMAND for further consideration of Konrad's trespass

---

[59]    *Id.* (footnotes omitted).

[60]    *See id.*

claim consistent with this opinion. We VACATE the superior court's award of attorney's fees and REMAND for reconsideration of the prevailing-party status and attorney's fees calculations.

## APPENDIX A

For illustrative purposes only — not to scale.



**6948**