Sullivan
No. 2011-227

MICHAEL O'HEARNE & a.

v.

JAMES MCCLAMMER, JR.

JAMES U. MCCLAMMER, JR., TRUSTEE OF THE PROFIT SHARING PLAN
OF CONNECTICUT VALLEY ENVIRONMENTAL SERVICES, INC.

v.

MICHAEL W. O'HEARNE & a.

Submitted: March 13, 2012
Opinion Issued: March 23, 2012

*Buckley and Zopf,* of Claremont (*Anthony F. DiPadova, Jr.* on the brief), for Michael W. O'Hearne and Marie E. O'Hearne.

*Clauson & Atwood,* of Hanover (*Bradford T. Atwood* on the brief), for James U. McClammer, Jr., individually and as Trustee of the Profit Sharing Plan of Connecticut Valley Environmental Services, Inc.

HICKS, J. James U. McClammer, Jr., Trustee of the Profit Sharing Plan of the Connecticut Valley Environmental Services, Inc., appeals an order of the Superior Court (*Wageling,* J.), following a bench trial on the merits, ruling in favor of Michael W. O'Hearne and Marie E. O'Hearne on the parties' cross-petitions to quiet title and for injunctive relief. We affirm.

The parties own adjoining lots in the vicinity of the Little Sugar River in North Charlestown; McClammer owns the southerly lot, while the O'Hearnes own the lot to the north. Historically, both lots were part of a larger parcel bisected by the river, which generally runs in an east-west direction at that point. In 1790, the larger parcel was subdivided by a deed conveying "all that part or parcel of land being and lying on the North side of Little Sugar River . . . [e]xcept three quarters of an acre of land that will best accommodate a Mill Spot." Title to the O'Hearne lot is, ultimately, derived from this conveyance, while the McClammer lot was included in the land retained by the grantor of the 1790 deed.

Prior to 1929, deeds within McClammer's chain of title referenced the river in describing the northern bound of his parcel. For instance, an 1872 deed contained the following legal description of the McClammer lot:

> beginning near the south end of the South Bridge on Little Sugar
> River and running southwesterly on the highway . . . to land of

said P & M Howard thence northerly on land of said Howard to the south bank of said river, thence easterly on said river to the place of beginning . . . .

A 1907 deed within the McClammer chain, however, described the parcel's northern bound as running "Easterly on said river *and land* of one Woodward." (Emphasis added.) "[L]and of one Woodward" included the O'Hearne lot.

In 1929, a deed to the McClammer parcel did not reference the river at all in describing the boundaries, and for the first time described the parcel by courses and distances between artificial monuments. Three of the monuments were located south of the river, at what McClammer described as "the edge of the river's flood plain" along the northern portion of the parcel. Two of the monuments currently exist, while the easternmost monument, described in the deed as "ten (10) feet eight (8) inches from the southwesterly end of" the same bridge referenced in the 1872 deed, was removed by the New Hampshire Department of Transportation (DOT) when it replaced the bridge in the early 1980s.

Although early deeds within the O'Hearne chain of title also appear to have referenced the river in describing the property, an 1882 deed described the southern boundary as running "Easterly on . . . land [owned by McClammer's predecessors] to the Highway" without mentioning the river at all. Since 1936, the deeds within the O'Hearne chain describe the southern boundary of the parcel as running "on land now or formerly of [McClammer's predecessor] to the highway (easterly)," also without mentioning the river.

McClammer acquired title to his lot in 1999 from the estate of Louise Hinchliffe, who had acquired her title upon the intestate deaths, in 1944 and 1957, of the grantees of the 1929 deed. The property description in McClammer's deed was identical to the description in the 1929 deed. The present dispute arose when McClammer began removing trees from the strip of land lying to the north of the monuments and to the south of the river.

The O'Hearnes filed a petition to enjoin McClammer from trespassing on their land, asserting that the parties' common boundary was established by the monuments. McClammer, in turn, filed his own petition to quiet title, claiming that his title ran either to the "so-called thread or center of the river," or to its low water mark on "the south side of [its] main northerly channel." Thereafter, McClammer amended his petition, asserting that his title extended to the high water mark on the northern bank of the river, and included a 0.15 acre piece of land to the north of the river where, he claimed, the "mill spot" referenced in the 1790 deed was located. In their

answers to McClammer's petition and amended petition, the O'Hearnes claimed not only that they had record title to the areas in dispute, but that they had also acquired title by adverse possession and the doctrine of boundary by acquiescence.

The trial court consolidated the matters, and following a trial on the merits, ruled in favor of the O'Hearnes. In its narrative order, the trial court declined to interpret the parties' deeds, but instead ruled that McClammer's claims were barred by the twenty-year statute of limitations set forth in RSA 508:2 (2010), which the court determined had been triggered either by the legal description of the O'Hearne lot in the 1882 deed, or by the description in the 1929 deed to McClammer's predecessors. Alternatively, the trial court ruled that the O'Hearnes had acquired title to the disputed areas through adverse possession.

With respect to adverse possession, the trial court found that "two very important factors speak in [the] O'Hearne[s'] favor." First, the trial court noted that the O'Hearnes asserted ownership pursuant to "a long-standing sequence of recorded deeds, which support [their] position that the boundary is defined by markers." Both the O'Hearne and McClammer chains of title, according to the trial court, had described the parties' boundary with reference to the monuments since 1936. Second, the trial court found that McClammer's predecessor-in-title had actual notice that the disputed property was possessed by the O'Hearnes. Specifically, the trial court noted: (1) McClammer's predecessor, Louise Hinchliffe, repeatedly walked the boundary claimed by the O'Hearnes with Michael O'Hearne (Michael), and otherwise "acted in a way consistent with [the] O'Hearne[s'] assertion that she did not consider the thread of the river to be the boundary"; (2) Hinchliffe wrote a letter to the DOT in 1983 in connection with its replacement of the bridge that was consistent with the O'Hearnes' claims concerning the boundary; and (3) Michael had, at Hinchliffe's request, maintained "No Trespassing" signs on the portion of land under dispute, and cut down a tree in the disputed area that was overhanging Hinchliffe's property. These facts, according to the trial court, established that "McClammer's predecessor in interest abided by the exclusive boundary, as defined by the markers, and did so for over 20 years." As to the so-called "mill spot," the trial court found no evidence that McClammer or Hinchliffe ever used it, and that the O'Hearnes in fact used and improved it over a period exceeding twenty years.

In addition to its narrative order, the trial court ruled on the parties' detailed requests for findings of fact and rulings of law. Relying upon *Mastroianni v. Wercinski*, 158 N.H. 380, 383 (2009), and *Rautenberg v. Munnis*, 108 N.H. 20, 23 (1967), the trial court ruled that a boundary may be established by acquiescence and prevail over contrary descriptions in

deeds to the extent that the parties recognize the boundary as true for twenty years, and occupy their lots accordingly. The trial court then found and ruled that: (1) "Hinchliffe clearly acquiesced, for a period in excess of 20 years, that the boundary line separating the parties' property is the line claimed by the [O'Hearnes]"; and (2) the O'Hearnes had established title "by adverse possession both due to the acquiescence of the claimed boundary by Louise Hinchliffe and by their continuous use and possession of the land in question."

McClammer moved for reconsideration, arguing that the trial court had improperly raised the statute of limitations *sua sponte*. Additionally, he challenged the trial court's rulings on the merits, arguing that it had erroneously found that the O'Hearne chain of title referenced the monuments, that it improperly construed the relevant deeds, and that it ignored other evidence inconsistent with a finding of adverse possession. The trial court denied the motion, concluding that the O'Hearnes had sufficiently raised the statute of limitations by pleading adverse possession, and that, because McClammer's claim was time-barred, he "lack[ed] standing to challenge [its] findings with respect to [the O'Hearnes'] ownership of the disputed strip."

This appeal followed. On appeal, McClammer argues that the trial court erred by: (1) ruling that his petition to quiet title was time-barred under RSA 508:2, and not allowing him a rehearing to submit evidence rebutting the ruling; (2) finding that the O'Hearnes acquired title to the property in dispute by adverse possession or acquiescence; (3) relying upon the 1929 deed, which McClammer claims is ambiguous, to support its finding as to the location of the boundary; and (4) not finding that he had title to the "thread," or center, of the river.

■ At the outset, we note that the trial court relied upon RSA 508:2, adverse possession, and boundary by acquiescence as alternative grounds for ruling in favor of the O'Hearnes. While McClammer claims he "was prejudiced by the trial court's *sua sponte* ruling [that he was time-barred] as he was not provided an opportunity to present evidence on adverse possession," the record reflects that the O'Hearnes raised adverse possession and boundary by acquiescence in their pleadings, that the parties presented evidence at trial relative to those theories, and that McClammer himself, in his request for rulings of law, sought a ruling that the O'Hearnes had "fail[ed] to satisfy the legal elements . . . [of] either adverse possession or boundary by acquiescence." Even if the trial court erred by applying RSA 508:2, and by ruling, on reconsideration, that McClammer lacked standing to challenge its findings on adverse possession and boundary by acquiescence, we conclude that the evidence supports the trial court's

ruling that the O'Hearnes acquired title through Hinchliffe's acquiescence in the boundary. Accordingly, we need not address whether the trial court erred by applying RSA 508:2 or ruling that McClammer lacked standing to challenge its findings. *See Kessler v. Gleich*, 156 N.H. 488, 494 (2007) (trial court will be upheld where error does not affect outcome, or where we can determine that no injury occurred).

■ We also note that the parties in their briefs, and the trial court in ruling that the O'Hearnes acquired title "by adverse possession . . . due to the acquiescence of the claimed boundary by Louise Hinchliffe," appear to conflate the theories of adverse possession and boundary by acquiescence. "To acquire title to real property by adverse possession, the possessor must show twenty years of adverse, continuous, exclusive and uninterrupted use of the land claimed so as to give notice to the owner that an adverse claim is being made." *Mastroianni*, 158 N.H. at 382. Absent actual notice by the dispossessed party of the adverse possession of his or her land, "[t]he law requires more than occasional, trespassory maintenance [of another's property] in order to perfect adverse title; the use must be sufficiently notorious to justify a presumption that the owner was notified of [the claim]." *Blagbrough Family Realty Trust v. A & T Forest Prods.*, 155 N.H. 29, 34 (2007); *see Mastroianni*, 158 N.H. at 383-84.

■ By contrast, "[a]cquiescence may establish a boundary where the parties for twenty years or more have recognized a certain boundary as being the true one and have occupied their respective lots accordingly." *Rautenberg*, 108 N.H. at 23; *see Mastroianni*, 158 N.H. at 383. "The bound thus acquiesced in will prevail even over the description in the deeds." *Rautenberg*, 108 N.H. at 23. To establish a boundary by acquiescence, a party generally must prove that: (1) the parties are adjoining landowners; (2) who have occupied their respective lots up to a certain boundary; (3) which they have recognized as the true boundary separating the lots; and (4) have done so for at least twenty years. *See id.*; 9 R. POWELL, POWELL ON REAL PROPERTY § 68.05[2], at 68-24 (Michael Allan Wolf ed., 2011). A boundary established by acquiescence is conclusive upon successors in title. *Lakeview Farm, Inc. v. Enman*, 689 A.2d 1089, 1092 (Vt. 1997).

■ Although these doctrines, in practical application, may be similar, they are distinct theories that have developed independently from each other both in New Hampshire and elsewhere. *See, e.g., Spilinek v. Spilinek*, 337 N.W.2d 122, 124 (Neb. 1983); *Walters v. Snyder*, 570 N.W.2d 301, 303 (Mich. Ct. App. 1997); *see also* 9 R. POWELL, *supra* § 68.05[3] (distinguishing boundary by acquiescence from doctrines of estoppel, adverse possession and post-conveyance agreement). While "adverse possession developed

from the statutes of limitation on actions for the recovery of land," *Hewes v. Bruno*, 121 N.H. 32, 33 (1981), we long ago explained that boundary by acquiescence is grounded "upon principles of public policy, [that preclude a party] from setting up or insisting upon a boundary line in opposition to one which has been steadily adhered to, upon both sides, for more than twenty years," *Richardson v. Chickering*, 41 N.H. 380, 384 (1860).

■ In this case, although the parties and the trial court may not have carefully delineated the doctrines of adverse possession and boundary by acquiescence, the trial court correctly noted that a boundary may be established by the parties' mutual recognition of the boundary as correct, and consistent occupation of their lots, for twenty years. In context, we construe the trial court's determinations that Hinchliffe "acquiesced, for a period in excess of 20 years," in the boundary claimed by the O'Hearnes, and that the O'Hearnes established title to the land in dispute through Hinchliffe's acquiescence, as a ruling that the O'Hearnes satisfied the requirements of boundary by acquiescence. "We review the trial court's legal rulings *de novo*, but defer to its findings of fact if supported by the record." *Mastroianni*, 158 N.H. at 382 (citation omitted).

■ The testimony at trial supports this ruling. Michael, who had lived on the O'Hearne lot for sixty-eight years at the time of trial, testified that as a child, his father and predecessor-in-title, Walter O'Hearne (Walter), would take him across the river and point out the boundary and boundary markers to him. Michael further testified that he and Hinchliffe, who had sole title to the McClammer lot from 1957 until her death in 1997, walked the boundary line together on multiple occasions throughout the years and identified the boundary markers. According to Michael, Hinchliffe herself told him that the monuments were "boundary" markers. Based upon this testimony, the trial court supportably found that Michael and Hinchliffe "walked the boundary line as [Michael] claims it to exist . . . many times over a period of time . . . exceed[ing] twenty years," and that they "identified the markers now identified on [Michael's] survey and . . . recognized the boundary shown in [his] survey as being the true boundary between the respective properties."

Consistent with this testimony, the record reflects that in 1983, Hinchliffe wrote the DOT and advised it of her intention "to meet [with Walter] and have a marker placed 10 ft. 8 inches from the concrete end of the bridge over Little Sugar River." Ten feet, eight inches from the end of the bridge is consistent with the location identified in the 1929 deed of the monument removed by the DOT in connection with its replacement of the bridge. Also in connection with the bridge replacement, both Hinchliffe and Walter deeded small portions of their land to the State in 1983; the deed from

Walter included 0.02 acres of land both north and south of the river, bounded to the south "by land ... of ... Hinchliffe," while Hinchliffe deeded 0.01 acres of land extending "[n]ortherly to land ... of Walter." The DOT's survey of the bridge identifies the boundary between the McClammer and O'Hearne lots as being south of the river. The trial court sustainably found this evidence to establish that both the O'Hearnes and Hinchliffe recognized "that the true location of the now disputed boundary is consistent with the" boundary claimed by the O'Hearnes.

In addition to testimony establishing Hinchliffe's recognition of the monuments as boundary markers, the O'Hearnes presented other testimony demonstrating their occupation of the area in dispute, and recognition of their occupation by McClammer's predecessors. For instance, Michael testified that in the early 1950s, Charles Elie, Hinchliffe's brother and a grantee of the 1929 deed, requested permission from Walter to run an irrigation line from the river and between two of the markers in order to irrigate strawberry beds on the McClammer lot. Michael also testified that Hinchliffe asked him to keep the area south of the river and north of the markers free of debris to prevent flooding onto her property, and that he would comply with her request by cutting wood in that area and clearing it of debris. He further testified that he removed a tree from the disputed area, again at Hinchliffe's request, because she was concerned that it would damage a garage on her property. Finally, Michael testified that he installed "no trespassing" signs in the disputed area in 1970, at Hinchliffe's specific request, because she was concerned that trespassers accessing the southern bank of the river in the area north of the monuments were encroaching upon her land to do so. Those signs remained there until McClammer removed them in approximately 2005. According to Michael, there had never been any kind of boundary dispute between his family and owners of the McClammer lot until McClammer acquired it.

■ We conclude that there was more than ample support for the trial court to have found that the O'Hearnes, their predecessors, and McClammer's predecessors mutually recognized the boundary marked by the monuments as the true boundary between the adjoining lots, and occupied the lots accordingly for a period in excess of twenty years. *Rautenberg*, 108 N.H. at 23; *see Lakeview Farm, Inc.*, 689 A.2d at 1092 (boundary by acquiescence established where at least two generations of neighboring landowners accepted a fenced and blazed line as the common boundary, walked the fence line to confirm the boundary, and used their lots consistent with the boundary over a period exceeding requisite time frame under Vermont law). While the trial court may also have found that the O'Hearnes' use of the property south of the river was "occasional" and

"shared" with Hinchliffe, these findings are not inconsistent, under the circumstances of this case, with establishment of the boundary by acquiescence. *See Marja Corp. v. Allain*, 622 A.2d 1182, 1185 (Me. 1993) (acquiring title by acquiescence does not require continuous or exclusive occupation but only occupation sufficient to provide notice of claim). Upon this record, we cannot conclude that the trial court's ruling that the O'Hearnes acquired title to the area in dispute due to Hinchliffe's acquiescence in the boundary claimed by the O'Hearnes was either unsupported by the evidence or erroneous as a matter of law. *See Mastroianni*, 158 N.H. at 382.

To the extent the trial court incorrectly found that the O'Hearne chain of title referenced the monuments, this finding cannot have affected the outcome of the case since the trial court's findings and rulings relative to Hinchliffe's acquiescence in the boundary are supported by the record and compel the result reached by the trial court. *See Kessler*, 156 N.H. at 494. Similarly, any error in the trial court's purported "reliance" upon the 1929 deed is harmless. *See id.*

Finally, to the extent McClammer claims that the boundary found by the trial court is the high water mark of the river and, thus, that he has title to the "thread" of the river, *see Sheldon v. Sevigny*, 110 N.H. 419, 422-23 (1970), the only part of the record that he cites in his brief to establish that he preserved this issue, *see* SUP. CT. R. 16(3)(b), is a response he filed to an objection to his motion for reconsideration. While in his initial petition to quiet title McClammer claimed that his title extended to the thread of the river, he did so on the basis that the river, and not the artificial monuments, marked his boundary. Indeed, he claimed that the monuments were "at the edge of the river's flood plain," that the O'Hearnes wrongly claimed title to the "upland lying in the flood plain along the *south* side of the [river] between [the] river and [his] land," and that, over time, the river had "gradually migrated northward, accreting land onto the south bank" and entitling him to the accretions. Nowhere in the petition or amended petition did McClammer allege that the monuments established his boundary at the high water mark of the river, entitling him to the disputed land as part of the river itself. In the response to the objection to his motion for reconsideration, however, McClammer asserted that the monuments in fact were located at "the ordinary high water line of the [river]," an assertion inconsistent with the testimony of his expert, who claimed that they were not at the high water mark of the river, but at its "flood mark."

██ "Issues must be raised at the earliest possible time, because trial forums should have a full opportunity to come to sound conclusions and to correct claimed errors in the first instance." *SNCR Corp. v. Greene*, 152

N.H. 223, 224 (2005) (quotation and brackets omitted). Here, we conclude that McClammer did not timely raise this claim in a post-trial response to an objection to a motion for reconsideration. Even if he had timely raised the claim, however, the evidence at trial does not compel a finding that the boundary markers are located at the high water mark of the river.

*Affirmed.*

DALIANIS, C.J., and CONBOY and LYNN, JJ., concurred.