NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2018-0591

TOWN OF DUNBARTON

v.

MICHAEL GUINEY & a.

Argued: September 25, 2019
Opinion Issued: February 5, 2020

Mitchell Municipal Group, P.A., of Laconia (Steven M. Whitley on the memorandum of law and orally), for the Town.

Wadleigh, Starr & Peters, P.L.L.C., of Manchester (Michael J. Tierney on the brief and orally), for the appellees

Panciocco Law, LLC, of Bedford (Patricia M. Panciocco on the brief and orally), for appellant.

HANTZ MARCONI, J. The appellant, Michael Guiney, appeals a declaratory judgment of the Superior Court (Kissinger, J.) ruling that the road between Guiney's house and barn has become a public highway by prescription. Guiney also appeals the trial court's decision on his cross-claim against the appellees, David Nault, Joshua Nault, and Leigh Nault (the Naults), which upheld boundary lines and a 50-foot wide right-of-way (50-foot ROW)

that appear in a 1988 boundary line agreement under the doctrines of boundary by acquiescence and estoppel by recitals in instruments. We reverse in part, vacate in part, and affirm in part.

The trial court found, or the record supports, the following facts. The relevant properties and Kelsea Road are located in Dunbarton. Guiney acquired his property (Lot 5) by deed dated March 30, 1999. David Nault purchased three lots (Lots 7, 8, and 9) to the west and north of Lot 5 between 1990 and 1998, and has a home on Lot 7. Nault later transferred Lot 8 to his son and daughter-in-law, and has retained Lot 9 with the intent of giving it to another one of his children. None of the Naults' Lots have frontage on a Class V road, including Kelsea Road, and the Naults access Kelsea Road via a right-of-way across Lot 5.

Kelsea Road is a Class V gravel road that exits west off of Montelona Road and continues in a southwesterly direction. As Kelsea Road reaches Lot 5, a traveled way spurs off to the west and continues between Guiney's house and barn. This westerly spur between Guiney's house and barn is referred to by the parties and throughout this opinion as the "disputed area."

In 1873, the original owners of the entire tract of land containing the properties relevant to this appeal conveyed a parcel, including what is now Lot 7, to Alfred Colby and kept Lot 5 for themselves. In the deed to that transfer, the owners granted Colby "the right forever to cross [Lot 5] in any manner and at all times in the old cart road." The cart road runs between the house and barn on Lot 5 and is approximately 13'-15' wide.

On June 24, 1988, Jean Gildersleeve (Gildersleeve), then the owner of Lot 5, entered into a "common boundary line and right-of-way-agreement" (BLA) with Abraham Braverman, who was the owner of Lot 7. This agreement was recorded in the Merrimack County Registry of Deeds on August 24, 1988, and re-recorded on January 27, 1989. The BLA provides, in part, that "a right-of-way exists over [Lot 5] for the benefit of [Lot 7]" and that the agreement "shall be a covenant running with the land, and shall be binding on all future owners of [Lot 5] and [Lot 7]." To help facilitate the agreement, a local land surveyor prepared a plan, which is referenced in the BLA and also recorded in the Merrimack County Registry of Deeds. The agreed-upon boundary lines and a 50-foot ROW shown at the end of the traveled way between Guiney's house and barn are detailed on the plan. This agreement was reaffirmed by a "confirmatory common boundary line and right-of-way agreement" (Confirmatory Agreement) entered into on June 26, 1998, by Gildersleeve and the executrix of Mrs. Braverman's estate. The Confirmatory Agreement is recorded in the Merrimack County Registry of Deeds.

When Guiney purchased Lot 5 from the Jean O. Gildersleeve Inter Vivos Trust in 1999, the deed described the boundaries of the property using the

language that appears in the BLA, including the 50-foot ROW in favor of Lot 7. Guiney testified that he received a copy of the BLA prior to purchasing Lot 5, and he did not question the agreement; rather, he was pleased that a survey of his property had been done. Shortly after moving in, Guiney had a discussion with Nault in which he acknowledged the existence of the right-of-way and Nault's right to use it. In 2015, Guiney recorded a plan in the Merrimack County Registry of Deeds which illustrates the boundary lines of his property as they are described in the BLA. Nault was also aware of the BLA prior to purchasing Lot 7 and understood it to be binding upon him and all future owners of the affected pieces of property.

Guiney moved into the house on Lot 5 almost immediately after purchasing it in 1999. Although he observed very little traffic near his house, Guiney observed plow trucks for the Town of Dunbarton (Town) plowing the disputed area during the winter and using space next to his barn to turn around and go back down Kelsea Road. Guiney also saw Town trucks grade Kelsea Road once or twice a year. Although the Town trucks never graded the disputed area between Guiney's house and barn, they used the space next to the barn to turn their trucks around when grading Kelsea Road.

At trial, the Naults introduced maps depicting Kelsea Road and had a number of witnesses testify to the Town's history of maintaining the road, but only two of them offered testimony speaking to that history prior to 1968.[1] One of those witnesses began working for the Town during adolescence in the 1950s or 1960s, and by the 1970s the Town assigned him his own plow route, which included Kelsea Road. He testified to plowing Kelsea Road up to the Guiney property travel-way and turning around next to the barn.

The second witness began working for the Town around 1958 while his father was the Town road agent. That employee testified to childhood memories of riding with his father while he plowed Kelsea Road up to the disputed area, plowed the disputed area, and turned around next to the barn. When the witness was hired by the Town, he continued to plow this route in the same manner as his father; and he did not make any changes to that practice when he became the Town road agent himself. Further, the witness testified to grading, sanding, and removing brush from Kelsea Road during his tenure with the Town, and that he understood the disputed area to be part of Kelsea Road. Although there was testimony that residents of Lot 5 had granted the Town permission to turn their trucks around next to the barn, the trial court found that the Town was never given, nor asked for, permission to plow or otherwise maintain the disputed area.

---

[1] To establish a public highway by prescription, RSA 229:1 requires evidence of public use of the road for 20 years prior to January 1, 1968. See RSA 229:1 (Supp. 2019). After 1968 a public highway no longer could be established by prescription. See id.

3

In 2006, Guiney filed a petition against Nault to quiet title to a "driveway" Nault had constructed over Lot 5, and outside of the disputed area, to access Lots 8 and 9. The trial court in that case explained that the "driveway" Nault had constructed was distinct from the right-of-way running east to west over Lot 5 to Lot 7, which was referred to by the court as the "cart road." The court concluded that, in light of the existing right-of-way, Nault did not have an easement by implication, necessity, or prescription to utilize the driveway he had constructed across Guiney's property. In the present case, the trial court took the outcome of that 2006 litigation into account when ruling on the Naults' motion for summary judgment and ruled that Guiney was judicially estopped from arguing that there was no right-of-way across Lot 5 that permits travel to and from Lot 7 and Kelsea Road.

In 2011, Guiney noticed the Town slowly widening the disputed area and, in an effort to protect his property from encroachment, he put up a post blocking the Town's access to the turnaround area next to his barn. The Town asked Guiney to take the post down as a gesture of good faith while an agreement was worked out between Guiney, the Town, and Nault, which he did. That exchange notwithstanding, the Town continued to widen the disputed area and told Guiney that the Town believed it had rights in the disputed area. In response, Guiney put new posts in the ground to block the turnaround area next to his barn.

In 2015, Guiney hired a surveyor to survey his property. The surveyor concluded that the boundary lines between Lot 5 and Lot 7 as they appear in the 1988 BLA are not consistent with the boundaries described in the 1873 deed conveying Lot 7 out of Lot 5. In his view, the boundaries as set out in the 1873 deed were "clear as day," and the true intent of the parties entering the 1988 BLA must have been to establish a new common boundary between the two lots. The Naults also hired a surveyor to survey the property and determine the boundary lines between Lot 5 and Lot 7. Contrary to the position maintained by Guiney's surveyor, the Naults' surveyor concluded that the boundaries described in the 1988 BLA accurately reflect the common boundary established by the 1873 deed that created Lot 7.

After more than a decade of dispute, the Town filed an action against Guiney and the Naults, seeking a declaratory judgment as to whether the disputed area has become a public highway by prescription. In the same action, Guiney asserted a cross-claim seeking to have the BLA invalidated and quiet title against the Naults. Following a three-day bench trial, the trial court ruled that, based on the testimony of Town employees and maps presented at trial, the disputed area is part of Kelsea Road by prescription. Further, the court assumed, without deciding, that the BLA was invalid. Nonetheless, the court ruled that the boundary lines between Lot 5 and Lot 7 had been established by acquiescence as they appear in the 1988 BLA, and that the 50-foot ROW laid out in the BLA was established and enforceable under the

doctrine of estoppel by recitals in instruments. The appellant filed a motion for reconsideration, which was denied, and this appeal followed.

We first address whether the disputed area between Guiney's house and barn has become part of Kelsea Road, a public highway, by prescription. We have construed the "public use" provision of RSA 229:1 as describing the establishment of a public highway through prescription. Blagbrough v. Town of Wilton, 145 N.H. 118, 122 (2000); see RSA 229:1. Whether a highway is created by prescription is a finding of fact. Mahoney v. Town of Canterbury, 150 N.H. 148, 150 (2003). Findings of fact by a trial court are binding unless they are not supported by the evidence or are erroneous as a matter of law. Id.

To establish a highway by prescription, it must appear that the general public used the way continuously without interruption for a period of twenty years prior to 1968. Id. In addition, the public use must be shown to have been adverse. Catalano v. Town of Windham, 133 N.H. 504, 509 (1990). The burden of proof on the issue of adversity, at least initially, lies with the party claiming the prescriptive easement. Mahoney, 150 N.H. at 151. Whether a use of property is adverse is an issue of fact. Id. at 152. Accordingly, in this case, the Town[2] has the burden of proving by a "balance of the probabilities" that the public used the disputed area for twenty years prior to 1968, under a claim of right without the owner's permission. See Catalano, 133 N.H. at 510.

The Naults argue, and the trial court found, that the disputed area has become a public highway by prescription. In their brief, the Naults point to testimony from Town employees and ancient maps introduced at trial, which were relied upon by the trial court, as evidence to support the trial court's finding of a public highway by prescription. The maps relied upon by the trial court included: the 1925 State of New Hampshire Highway Department Geological Survey; the 1925 United States Geological Survey Map and 1949 revision thereof; the Atlas Map; the 1941 Property Ownership of the Town of Dunbarton; "the 1969 USUS Map and 1985 revision thereof"; and the 1969 N.H. Department of Resources and Economic Development Map of Dunbarton Early Landmarks and Highways. The trial court found that these maps provide evidence that Kelsea Road has been documented to include the disputed area for decades prior to 1968 and, taken together with the testimony of Town employees, they establish that the public used the road under a claim of right for a period of 20 years prior to 1968.

This court has held that "the inclusion of a road on a map is competent evidence to support the inference of use of the road." Blagbrough Family

---

[2] By virtue of its having filed the action, the Town was the plaintiff for purposes of the prescription claim, and therefore had the burden of proof. However, it was the Naults, rather than the Town, who presented evidence at trial and now argue on appeal in favor of finding a highway by prescription.

Realty Trust v. A & T Forest Prods., 155 N.H. 29, 36 (2007) (quotation omitted); see Gill v. Gerrato, 156 N.H. 595, 597 (2007); Mahoney, 150 N.H. at 151; Williams v. Babcock, 116 N.H. 819, 822 (1976). However, we have not addressed whether the appearance of a road on ancient maps, without more, can be sufficient to establish a public highway by prescription. See Blagbrough Family Realty Trust, 155 N.H. at 36 (relying on maps and stone walls lining both sides of the road to uphold a finding of highway by prescription); Williams, 116 N.H. at 822-23 (indicating that maps, cellar holes along the road, and a 1795 deed would support a finding of highway by prescription).

For example, in Mahoney, the trial court's finding of a public road by prescription was supported, not only by a number of ancient maps, but also by three deeds from the mid-1800s that made specific reference to public use of the road in question, and testimonial evidence about the public's use of the road during the 1950s and 1960s. Mahoney, 150 N.H. at 151. We held that, viewed holistically, the evidence was sufficient to support a finding of adverse public use, and, in turn, a public highway by prescription. Id. Similarly, in Gill, the trial court relied on deeds pre-dating the Revolutionary War and ancient maps to support a finding of public use of a road. Gill, 156 N.H. at 596-97. In finding said public use to be adverse, the trial court pointed to the fact that the road in question led to the Weeks Mill, an "oft-mentioned commercial enterprise," which permitted the inference that the public used the road to travel to that business without permission from anyone. Id. at 597. Taking the evidence of public use and adversity together, we affirmed the trial court's finding of a public highway by prescription. Id.

In the case now before us, the maps presented to the trial court that predate 1968 are undoubtedly competent evidence to support an inference of public use. However, "[e]vidence of continuous and uninterrupted public use of the premises for the statutory period, though uncontradicted, is insufficient alone to establish prescriptive title as a matter of law." Wason v. Nashua, 85 N.H. 192, 198 (1931). It still must be established that the public use was adverse; that is, the public used the road under a claim of right and without permission from the owner. Catalano, 133 N.H. at 509. Thus, the maps alone cannot establish that the disputed area became a public highway by prescription as early as 1939, contrary to the argument offered by the Naults.

Unlike the cases previously cited wherein the court relied primarily on maps, this case has no secondary indicia, such as stone walls lining the road, cellar holes,[3] or commercial enterprises, from which we can infer adverse use of the road under a claim of right without the owner's permission. Rather, the evidence of adverse use by the public prior to 1968 is limited to the testimony

---

[3] Nault testified to two cellar holes existing on Lot 7 when he purchased it. However, the 1873 deed to Alfred Colby creating Lot 7 granted him a right-of-way over Lot 5 to access his property that has run with the land since that time, thereby negating any inference of adverse public use.

of two witnesses who were employed by the Town and plowed the disputed area.[4]  "Where, as here, this essential element is left to be implied solely from the public use, it must appear that such use was of a character calculated to apprise the owner that it was had under a claim of right."  Wason, 85 N.H. at 198.  "The nature of the use must be such as to show that the owner knew, or ought to have known, that the right was being exercised, not in reliance upon his toleration or permission, but without regard to his consent."  Id.

At the time the Town filed its petition for declaratory judgment, it did not believe the disputed area had become a part of Kelsea Road by prescription.  Indeed, the Town asserted in its petition that "any plowing or town maintenance that may have occurred during the prescriptive period was not performed under a claim of right, but simply to reach an area where the plow truck would be able to safely turn around."  Further, Town employees incidentally plowing a small piece of property for the purpose of reaching a safe place to turn around is not the sort of public use that is "calculated to apprise the owner that it was had under a claim of right."  Wason, 85 N.H. at 198.  A reasonable person would not understand the Town to be making a claim of right to their property by such conduct.

Although the evidence presented to the trial court may support a finding of public use, it does not support a finding of adverse public use, and was, therefore, insufficient to support a finding of a public highway by prescription.  Accordingly, we reverse the decision of the trial court and hold that the disputed area has not become a public highway by prescription.  Because we have held that the disputed area did not become a public highway by prescription, any question as to the width of the public way has been rendered moot.  See Londonderry Sch. Dist. v. State, 157 N.H. 734, 736 (2008).

Guiney has also raised a question as to whether the trial court erred in deciding that Kelsea Road turns to the west toward the disputed area rather than finding that it travels in a southerly direction to the Goffstown border in accordance with the Town's 1821 layout of the road.  As the Naults correctly point out, however, the 1821 layout of Kelsea Road is irrelevant to our prescription analysis.  Moreover, the trial court did not rely on it or incorporate it into its analysis.  While the trial court stated that Kelsea Road travels in a westerly direction (i.e., along the disputed area) rather than in a southerly direction beyond the Guiney property, we understand that conclusion to flow from its immediately preceding determination that the disputed area had become part of Kelsea Road by prescription.  Because we have reversed that ruling, the result that would have followed from it cannot be given effect.  However, having determined that the disputed area is not part of Kelsea Road

---

[4] More than two witnesses testified to plowing the disputed area and the Town's maintenance of Kelsea Road.  However, all but two of them offered testimony regarding maintenance after 1968, which is irrelevant to our prescription analysis.  See Blagbrough, 145 N.H. at 124; RSA 229:1.

7

by prescription, we decline to undertake the unnecessary task of identifying the extent of Kelsea Road, and vacate the trial court's finding on that issue.

Next, we address the trial court's order regarding the boundary lines between Lots 5 and 7 as established by the 1988 BLA. We note at the outset that the trial court assumed, without deciding, that the BLA is invalid. Nevertheless, the trial court upheld the boundary lines as they appear in the BLA pursuant to the doctrine of boundary by acquiescence. In his notice of appeal, and in his motion for reconsideration to the trial court, Guiney asserts that the trial court erred by sua sponte applying the doctrine of boundary by acquiescence. However, Guiney's brief provides no support for this proposition; nor does it articulate what evidence he would have offered to rebut the doctrine or how he was prejudiced by its application. Thus, we conclude that the trial court did not unsustainably exercise its discretion by sua sponte applying the doctrine of boundary by acquiescence. See generally Exeter Hospital v. Hall, 137 N.H. 397 (1993).[5]

In light of the trial court's decision, we need not, and do not, pass upon the validity of the BLA; as the trial court did, we assume, without deciding, that the BLA is invalid. Boundaries may be established by acquiescence where the parties have recognized a certain boundary as being the true one and have occupied their respective lots accordingly for twenty years or more. O'Hearne v. McClammer, 163 N.H. 430, 435 (2012). "The bound thus acquiesced in will prevail even over the description in the deeds" and "[a] boundary established by acquiescence is conclusive upon successors in title." Id. (quotation and citation omitted). To establish a boundary by acquiescence, a party generally must prove that: (1) the parties are adjoining land owners; (2) who have occupied their respective lots up to a certain boundary; (3) which they have recognized as the true boundary separating the lots; and (4) have done so for at least twenty years. Id. In reviewing the trial court's decision, we review its legal rulings de novo, but defer to its findings of fact if supported by the record. Id. at 436.

The trial court found that the parties and their predecessors in title treated the boundaries described in the 1988 BLA as the true ones for a period of almost 30 years. Additionally, the parties to the BLA had been neighbors for 20 years before entering that agreement, and therefore the court found it conceivable that they treated the boundaries contained therein as the true boundaries since 1967. The BLA, which describes the boundaries between the two Lots and was recorded in the Merrimack County Registry of Deeds on August 24, 1988, is not the only evidence of acquiescence in the described

---

[5] Similarly, in Guiney's notice of appeal, he asserts that the trial court erred by assuming, without deciding, that the BLA is invalid. However, in his brief, he fails to develop this argument or cite any authority, and therefore we decline to address it. See White v. Auger, 171 N.H. 660, 665 (2019); Douglas v. Douglas, 143 N.H. 419, 429 (1999).

8

boundaries.  After 1988, the same boundaries, described or depicted in the same way, were reaffirmed four different times in plans recorded either by the parties or their predecessors in title: first, by the BLA, which was re-recorded on January 27, 1989; second, by a "confirmatory common boundary line and right-of-way agreement," recorded August 19, 1998; third, by Guiney's deed, recorded April 8, 1999; and fourth, by a plan, recorded by Guiney on September 17, 2015.

Guiney argues that the BLA shifted 7 acres from Lot 5 to Lot 7, and that there is no evidence of actual occupation up to the boundary line effectuating that shift because it runs through the woods located between the two Lots.  We disagree.

There is undisputed evidence in the record that Nault built roadways to Lots 8 and 9, without objection from Guiney, on land he would not own if Guiney were now allowed to quiet title to the disputed acreage.  Guiney also argues that the parties never knew where the boundary lines were, but the evidence fails to support this assertion. Guiney testified at trial that he had an opportunity to review the BLA and knew he would be subject to it before purchasing Lot 5.  He further testified that he believed the boundaries contained in the BLA and his deed to be the true boundaries and that he never made a claim to any portion of Lot 7.  Similarly, Nault testified that he had discussed the boundaries with Gildersleeve, Guiney's predecessor in title, and she never took the position that she owned any property west of the lines described in the BLA, as Guiney does now.  Further evidence of Guiney's acquiescence is exhibited by the fact that, when he was before the Town zoning board to oppose the grant of variances allowing Nault to build on Lots 8 and 9, he did not contest the boundary lines.

The doctrine of "boundary by acquiescence is grounded upon principles of public policy, [that preclude a party] from setting up or insisting upon a boundary line in opposition to one which has been steadily adhered to, upon both sides, for more than twenty years." O'Hearne, 163 N.H. at 436 (quotation and alteration omitted).  Having been presented with testimony reflecting nearly 30 years of adherence, five officially recorded affirmations of the boundary lines as they appear in the 1988 BLA, as well as evidence of Guiney's acquiescence and Nault's actual occupation, we affirm the trial court's finding that the boundaries between Lot 5 and Lot 7 have been established by acquiescence,[6] as supported by sufficient evidence in the record.

---

[6] To be clear, neither the trial court's finding of boundary by acquiescence nor our upholding of that finding "saves" the BLA as is suggested by Guiney in his brief.  The validity of a boundary line agreement has no bearing on whether boundaries have been established by acquiescence and vice versa.  Whether the BLA is valid remains unresolved, as neither we nor the trial court ruled upon its validity.

Finally, we are tasked with deciding whether Guiney is estopped from denying the existence of a 50-foot ROW appearing in his deed and in the 1988 BLA. The trial court found that Guiney was estopped by the doctrine of recitals in instruments because he signed his deed with notice of the right-of-way, and that both testimony at trial and Guiney's position in the 2006 litigation provided evidence of the Naults' detrimental reliance.

The concept of estoppel has engendered much confusion such that it is sometimes unclear to courts and parties what estoppel doctrine is being, or should be, applied in a particular case. See Kellison v McIsaac, 131 N.H. 675, 681-82 (1989). Here, the trial court applied the doctrine of estoppel by recitals in instruments with reference to the easement interest called out in Guiney's deed. Estoppel by recitals in instruments, however, requires a showing of detrimental reliance. See Trachy v LaFramboise, 146 N.H. 178, 183 (2001) (2-1 decision). Although the trial court determined that Nault relied on there being a ROW to his property, there is no evidence in the record to support a finding that Nault relied on the ROW being 50 feet wide. The record establishes only that Nault used a portion of the 50-foot ROW for access. Thus, the requirements for estoppel by recitals in instruments are not met. Id.

In contrast, judicial estoppel stands on different footing. Under this doctrine, a litigant may not take an adverse position to one taken in a prior judicial proceeding. See Alward v. Johnston, 171 N.H. 574, 584 (2018). The Naults have argued that Guiney is judicially estopped from denying the validity of the 50-foot ROW. We agree. In its order on the motion for summary judgment, issued February 14, 2018, the trial court ruled that Guiney was judicially estopped from denying the existence of a right-of-way over Lot 5 in favor of Lot 7 extending to the end of Kelsea Road by virtue of positions he took in the 2006 litigation. Guiney did not appeal that order and his brief is silent on the application of judicial estoppel.

However, we recognize that Guiney's position in the 2006 litigation relied primarily upon the BLA, which erroneously identified the terminus of Kelsea Road as the disputed area between Guiney's house and barn, and identified the 50-foot ROW as beginning at that terminus. Thus, Guiney is judicially estopped only from denying that Nault's right-of-way provides Lot 7 access to Kelsea Road and that the portion of the right-of-way depicted in the BLA is 50-feet wide. We express no opinion as to the width of the right-of-way through the disputed area to Kelsea Road.

For the reasons expressed above, we reverse the trial court's finding that the disputed area has become a public highway by prescription; vacate the trial court's finding that Kelsea Road spurs west between Guiney's house and barn; affirm the trial court's finding that the boundaries between Lot 5 and Lot 7 have been established by acquiescence; and affirm the trial court's finding that Guiney is judicially estopped from denying the existence of the 50-foot ROW

10

outlined in the BLA from Lot 7 to the end of the disputed area.  See Handley v. Town of Hooksett, 147 N.H. 184, 189-90 (2001) ("This court will sustain the decision of the trial court if there are valid alternative grounds to support it.").

Reversed in part; vacated in part; and affirmed in part.

HICKS, BASSETT, and DONOVAN, JJ., concurred.

11